Syllabus.

# Wytheville.

## Overstreet v. Security Storage and Safe Deposit Company, etc.

### June 16, 1927.

1. Negligence—*Elevators—Contractor Removing Stock of Goods to Building in which there was an Elevator—Duty which Contractor Owed to Other Persons using the Elevator—Case at Bar.*—Tenants of a building in which there was an elevator employed a contractor, defendant in the instant case, to remove their stock of goods to the building and put the elevator in the building at the disposal of the contractor. The elevator was also at the disposal of all of the workmen in the building in connection with their work. Plaintiff was an electrician sent to the building by his employer to repair the lights on the elevator. Plaintiff had no contractual relations with the defendant. He was not in the building as a licensee or invitee of the defendant. Their relation with each other was that of third persons.

   *Held:* That defendant owed plaintiff only the duty it owed to mankind generally—that is, not to do any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject plaintiff to peril.

2. Negligence—*What Constitutes Negligence—Apprehension of Danger.*—One cannot be held guilty of negligence by reason of an act or omission which would not lead an ordinarily prudent person giving the matter thought to apprehend danger from it. One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable.

3. Negligence—*What Constitutes Negligence—Mere Possible Consequence—Anticipation of Some Injury.*—A high degree of caution might, and perhaps would, guard against injurious consequences which are merely possible; but it is not negligence, in a legal sense, to omit to do so. But it is not necessary that the particular injury should have seemed probable in advance. It is sufficient if the act or omission is such that a man of ordinary intelligence and prudence would anticipate that *some* injury was liable to result therefrom.

4. NEGLIGENCE—*Elevators—Contractor Removing Stock of Goods to Building in Which there was an Elevator—Duty which Contractor Owed to Other Persons using the Elevator—Locks Plugged and Doors Open—Case at Bar.*—Tenants of a building in which there was an elevator employed a contractor, defendant in the instant case, to remove their stock of goods to the building and put the elevator in the building at the disposal of the contractor. The elevator was also at the disposal of all of the workmen in the building in connection with their work. Plaintiff was an electrician sent to the building by his employer to repair the lights on the elevator. Plaintiff had no contractual relations with the defendant. The servants of the defendant had operated the elevator with the locks plugged and the doors opened for a week before the accident with perfect safety and no indication of danger. They continued to so operate it on the day of the accident and after the accident occurred. Plaintiff was injured by the sudden dropping of the elevator and his experts testified that the accident might have been caused by imperfect plugging or by the plugs being loosened by vibration, or being struck, but there was no evidence that the locks were not properly plugged, or that the plugs had been loosened by vibration, or otherwise. The fact that the elevator was used with safety immediately after the accident, as well as previously, negatived the idea that the drop was caused by the condition of the plugging.

*Held:* That men of ordinary prudence could not have reasonably supposed that they were subjecting the plaintiff to any peril in turning over to him the elevator in the condition in which they had just been using it for a week.

5. NEGLIGENCE—*Ordinary Care—Anticipation of Possible Dangers.*—Ordinary care does not require the anticipation of possible dangers, but only of those that usually happen or are likely to occur—not the particular injury, but that some injury is liable to result, or will probably result.

6. NEGLIGENCE—*Elevators—Elevator Operated with Locks Plugged and Doors Open—Burden of Proof—Case at Bar.*—In the instant case, an action for injuries sustained when an elevator dropped, plaintiff's experts testified that the falling of the elevator might have been attributed to the plugging of the locks, but they did not give it as their opinion that the accident was in fact attributable to that cause. The servants of defendant did what reasonably prudent men would have done under like circumstances, and when the plaintiff, who had the burden of proof, failed to show that the accident was due to the defective plugging done by defendant's servants, there was no evidence left to support the finding of the jury in favor of plaintiff. Evidence that the accident might have been caused by the defective plugging is not sufficient to support a finding that it was so

caused, in the absence of any evidence to show the defective condition of the plugging at the time of the accident, and in the face of evidence that immediately after the accident the plugging operated with perfect safety and without indication of any defect.

7. NEGLIGENCE—*Elevators—Injury to an Expert Electrician—Contributory Negligence of Electrician—Case at Bar.*—The instant case was an action by an expert electrician employed to fix the lights in an elevator, for injury incurred by the sudden dropping of the elevator. Plaintiff saw that the elevator was being operated by inexpert workmen with the doors open. A mere glance at the door would have shown plaintiff that the locks were plugged.

*Held:* That if as an expert he knew that plugging was not a safe method of operating the elevator, he should have noticed that the locks were plugged and it was negligence not to do so.

Error to a judgment of the Circuit Court of the city of Norfolk in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Walter Sibert* and *Geo. C. Cabell*, for the plaintiff in error.

*Baird, White & Lanning*, for the defendant in error.

BURKS, J., delivered the opinion of the court.

Mansbach Brothers, merchants in the city of Norfolk, had leased a building in Norfolk in which to do business, and, preparatory to moving in, had employed plumbers, painters, electricians and other workmen to put the building in order. They also employed the defendant in error, hereinafter called the security company, to remove their stock of goods from another building in the city to the new location. There was in the new

building a freight elevator, which Mansbach Brothers put at the disposal of any and all the workmen in the building in connection with their work.   This elevator extended three stories and its use was necessary for the security company in delivering the stock.   The security company was expected to use the elevator for that purpose, and the use of it was fully accorded to it when not occupied by some one else.   The use was by no means an exclusive use.   The elevator is what is known as an Otis automatic electric elevator, and was so constructed that when all of the doors to the hatchway are closed an electric contact is made and the elevator will move up or down the shaft on turning the control lever to the right or left.   If any one of the doors is open the elevator cannot be moved.   These doors cannot be opened from outside the elevator shaft.   Contact can be made, however, and the same result as closing the doors can be accomplished by plugging the locks with a wooden pin or plug inserted in the locks so as to hold down the plunger in the door facing.   This was frequently done by anyone using the elevator in the Mansbach building if he desired to leave a door open.

For about a week prior to the injury complained of, the security company had been using the elevator for delivery on the third floor of the stock it was transferring.   For the sake of convenience it had, from day to day, plugged the locks on the first and third floors, leaving the doors open on these two floors, but closed on the second floor, and always removing the plugs and closing the doors before leaving for the day.   It experienced no difficulty in thus operating the elevator, and neither saw nor heard of any indication that it was not working perfectly, though all of the workmen about

the building were making a like use of it whenever they had occasion.

On the day of the accident, Overstreet, an expert electrician, was sent to the building by his employer, Burkhart, to repair the lights on the elevator. When he arrived the lower door of the elevator was open and it was being used by the security company to carry up goods. He asked for the possession of the elevator but it was declined unless Mansbach so directed. He got Mansbach and came back to the elevator and Mansbach directed the servants of the security company to let Overstreet have the elevator for the short time he needed it to make the repairs, and they did so, and went off for another load. Dorley, who was the assistant of Overstreet, ran the elevator up to the second story, and Overstreet walked up to the second floor. When Dorley got to the second floor he opened the door, and Overstreet held the plunger back with his finger so that Dorley could lower the elevator until its top was level with the second floor. When this was done, he released the plunger and went in on top of the elevator where he had to make certain measurements. After doing this, he stepped out on the second floor and again held the plunger back with his finger so as to enable Dorley to bring the elevator up. Dorley then brought the elevator up until its floor was on a level with the second floor, when Overstreet released the plunger and stepped into the elevator. He shut the door and Dorley turned the controller to go down, but the elevator would not move. Just what occurred at this time is best given in the language of Dorley and Overstreet, who were in sole control of the elevator, and the only persons who were present.

Dorley says that after Overstreet got in, "we closed the door and the elevator would not start, and I turned

the crank, the lever on the starting side, for to come down and it would not move, and he went to reach up again to get the door and just about that time the thing come down." He says that Overstreet did not at this time touch the door, and no one else did, and that he and Overstreet were the only two people there when the accident happened.

On this question Overstreet testified as follows:

"Q. Mr. Overstreet, you say the elevator went down. What do you mean by that?

"A. It dropped of a sudden.

"Q. Dropped suddenly?

"A. Dropped from the second floor to the mezzanine.

"Q. Do you know about the speed of that elevator is?

"A. No, sir, I couldn't tell how much the speed was. It was just like a shot dropping down.

"Q. I mean what is the regular speed of the elevator?

"A. No, it is very slow, though.

"Q. It is a freight elevator?

"A. It is a freight elevator; not so very slow; ordinary speed.

"Q. About how far did it drop?

"A. Well, it dropped the distance from the second to the mezzanine, which the mezzanine cuts off from the first to the second floor, a distance of eight or ten feet, I guess; somewhere in the neighborhood of that.

"Q. During that time, Mr. Overstreet, did the helper of yours retain the switch on. In other words, he turned it over to go down?

"A. He turned it over to the down position; yes, sir.

"Q. And he held it in that position?

"A. Yes, sir.

"Q. And it remained in that position all the time?

"A. He had it in the down position when I looked up and started to close the door or see if the door was closed, when she dropped. I never did catch it. I dn't have a chance, it went from under me.

"Q. You didn't catch it?

"A. Not the door. I balanced myself with my hands.

"Q. Just explain what you did to get your hand hurt?

"A. Well, I threw my hand out to balance. My helper was holding the controller, he had a balance; I had nothing. My hand went through the top of the machine and the second floor a distance of about twelve inches with a three-eighth of an inch space.

"Q. A three-eighth of an inch space?

"A. Yes, sir.

"Q. Mr. Overstreet, had you seen either of those doors removed?

"A. I never noticed them that day. I only walked right in the door. The elevator was on the entrance at Tazewell street."

Experts testify on behalf of the plaintiff that the dropping *may have been caused* by the way in which the locks were plugged. A. B. Callows, one of these experts, testified as follows:

"Q. It has been testified to that this elevator dropped about eight feet. Is there any way that the connection through those locks could be responsible for that condition?

"A. Yes, sir.

"A. Yes, by several ways. One way it could be one side of the switch could be grounded and your coils could be grounded one of your coils in your motor and you have got half of your motor out, which would cause your motor to run away and that would make your motor run much faster and carry the elevator down. That would be one way. And another way, the switch could be arcing in there and causing your current at the top to be coming in and out and cause

the motor to run away, shooting all the current into the armature and not into the field, cutting the field out.

"Q. You speak of an arc there. What would cause that condition that would create that arc?

"A. Well, say that switch would be that far apart (indicating), one-eighth of an inch or something like that would draw an arc. By resistance, it would draw an arc.

"Q. It has been testified to that these two doors, the top and the bottom, were plugged in. It is possible that in the plugging process that that condition can be brought about there?

"A. Yes, sir.

"Q. How could that condition be brought about if they were plugged in?

"A. Well, he could plug that switch in one way and that would cause it to ground, and another way cause it to arc by being not proper contact.

"Q. Do you mean to say that if those switches were plugged in tight that those two conditions could be brought about?

"A. By vibration of the car it could make it break a little bit and make an arc in there and the resistance of the car would draw an arc; just go in and out."

The plaintiff gave it as opinion that "those switches being plugged in was the cause of my accident," but this was a mere opinion; he could not state it as a fact.

Both Dorley and Overstreet testify that when the elevator would not move Overstreet reached for the door, but did not touch it, and Overstreet says that Dorley "had it in the down position when I looked and started to close the door or see if the door was closed, when she dropped." Callows, the plaintiff's expert, from whose testimony we have quoted, testified, in part, on cross examination as follows:

"Q. Mr. Callows, suppose an elevator, even if it were plugged on the top and bottom floors, and the second floor switches were not plugged in and a man got into .the elevator and did not entirely close the door, and threw the motor on to come down and then closed the door, it would drop, wouldn't it?

"A. Yes, sir."

This answer the witness qualified when further pressed on cross examination as follows:

"Q. It would drop even though the connections were perfect at the bottom floor and the third floor?

"A. How is that?

"Q. Even though the elevator was in perfect condition, it would drop under those conditions?

"A. No, it would not drop.

"Q. It would not run down at all?

"A. It would run down. It would not drop down.

"Q. What do you mean by dropping?

"A. I mean falling, by dropping.

"Q. I don't think anybody has intimated this elevator fell anywhere. It would go down, wouldn't it?

"A. Yes, sir.

"Q. And it would go down at speed, wouldn't it?

"A. Go down at normal speed.

"Q. And go down suddenly?

"A. But not as fast as if it had a runaway motor on it. It would just go down normal speed by closing that door."

This elevator had been used, with the locks plugged, for a week before the accident, and on the day of the accident, after it happened, without any change in the plugging, and at all times it had acted normally and safely.

Overstreet was asked several times if he did know when he went there on the day of the accident that the

doors were out, and he replied "I didn't notice it," or "I never noticed it." He further testified in part as follows:

"Q. And you knew that some days prior to that, just a few days prior to that, the doors had been taken out and the contacts or switches had been plugged up?

"A. I knew the doors were out. I never noticed whether it was plugged up or not.

"Q. Didn't you just tell the jury that some few days before that you did know that?

"A. I said I knew the doors were out. But I didn't notice they were plugged up. If I had taken the doors out, I would have went to the pen house and plugged it.

"Q. You knew that did something; the elevator was moving up and down?

"A. Yes, sir.

"Q. Now, Mr. Overstreet, when you finally got inside the elevator to come down, just prior to the accident, you closed the doors, did you not, yourself?

"A. Yes, sir.

"Q. And your helper turned the controller over for the purpose of coming down?

"A. In the down position; yes, sir.

"Q. And he left that on, didn't he?

"A. He was still holding to it, yes, sir. It would not move.

"Q. I believe you stated that you closed the door and saw the elevator did not move, then you pushed the door again, didn't you?

"A. I started to.

"Q. Didn't you do it?

"A. No, sir, I did not get that far.

"Q. Are you certain you did not push it in?

"A. I started to. I don't remember touching it.

When I started to push it he went from under me. I don't know what happened the next second."

The accident occurred March 18th and Overstreet testified that he did all the electrical work on the building and was in charge of the job "from the second day of January until the second day I got hurt." Mansbach testified that the elevator was being constantly used by everybody about the building with the doors out, and that he was informed that was a safe way to operate it. As to the use of the elevator by Overstreet, he testified as follows:

"Q. That the elevator was operated and had been operated with the top and lower doors remaining open?

"A. Yes, sir, it had been operated constantly that way and Mr. Overstreet had been operating it himself previous to that several times, quite a bit.

"Q. Do you know whether the doors were open when he operated it?

"A. He worked about that building, and everybody seemed to operate it.

"Q. Do you know whether Mr. Overstreet did it?

"A. I saw him on the elevator. The doors were off most of the time of the removal."

Other witnesses for the defendant testify as to the use of the elevator generally by workmen in the building, and as to plugging the locks.

This action for damages was brought by Overstreet against the Security Storage and Safe Deposit Company, Mansbach Bros. and L. Snyder. There was a verdict for the plaintiff against the security company only for $2,000.00, which the trial court set aside because there was no evidence to support it.

[1] Overstreet had no contractual relations with the security company. He was in the building as the

servant of Burkhart, who had the contract to do the electrical work.  He was not there as the licensee or invitee of the security company.  Their relation to each other was that of third persons.  The security company owed him only the duty it owed to mankind generally—that is, not to do any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject him to peril.

In *Wittenberg* v. *Seitz*, 8 App. Div. 439, 40 N. Y. Supp. 899, it is said: "There was no contractual relation existing between these parties, and, therefore, the liability of the defendant for the injuries received by the plaintiff, if any exists, results from his failure to observe the obligations which the law imposes upon a party engaged in the prosecution of any work—of performing the same in such a manner as not to endanger the lives or persons of other parties.  This is a very well settled principle, and it is applicable to all cases where a person is engaged in the performance of work which, without the exercise of a reasonable degree of care and prevision, may be attended with risk and danger to others;   *   *."

In *Smith* v. *Brady*, 136 App. Div. 665, 121 N. Y. Supp. 474, referring to the case of *Bill* v. *New York, etc., Co.*, 60 App. Div. 471, 69 N. Y. Supp. 990, it is said that, "Where several independent contractors are working on a building, each of them owes to the employees of the other contractors a duty to exercise due care in performing his work, if it might otherwise be a source of danger to such employees while lawfully engaged in their work on the building."

In *Lisle* v. *Anderson*, 61 Okla. 68, 159 Pac. 278, L. R. A. 1917A, 128, the law is thus stated: "It will be seen that the rule deducible from the authorities

*supra* is that, whenever the circumstances attending the situation are such that an ordinary prudent person could reasonably apprehend that, as a natural and probable consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises, and if such care is not exercised by the party on whom the duty rests, and injury to another person results therefrom, liability on the negligent party to the party injured will generally exist, in the absence of any other controlling element or fact, and this, too, without regard to the legal relationship of the parties. Hence the defendants, who knew that the joists were to be used to support the tank of the heating and ventilating system, and whose duty it was to select and install the same, if they knew, or by the exercise of ordinary care could have known, that the plaintiff might reasonably be expected to go upon the joists in installing the tank, owed the plaintiff the duty to exercise ordinary care in the selection of said joists, although the relationship of master and servant did not exist."

[2, 3] In Cooley on Torts (Students Ed.), section 340, it is said: "One cannot be held guilty of negligence by reason of an act or omission which would not lead an ordinarily prudent person giving the matter thought, to apprehend danger from it. 'One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable. A high degree of caution might, and perhaps would, guard against injurious consequences which are merely possible; but it is not negli-

gence, in a legal sense, to omit to do so.' But it is not necessary that the particular injury should have seemed probable in advance. It is sufficient if the act or omission is such that a man of ordinary intelligence and prudence would anticipate that *some* injury was liable to result therefrom.''

[4, 5] Applying these principles to the facts of the case, we are unable to see negligence on the part of the security company that would subject it to liability to the plaintiff. The servants of the security company had operated the elevator with the locks plugged and the doors open for a week before the accident with perfect safety and no indication of danger. They continued to so operate it on the day of the accident and after the accident occurred, without any change in the plugging, and they continued to so operate it thereafter until the removal was completed. It is true that the experts for the plaintiff testified that the accident might have been caused by imperfect plugging in the first instance, or by their being loosened by vibration, or being struck, but there is no evidence that the locks were not properly plugged, or that the plugs had been loosened by vibration, or otherwise. In fact, there is no evidence that the plugs were examined by anyone after the accident, and the fact that the elevator was used with safety and no indication of trouble immediately after the accident as well as previously, negatives the idea that the drop was caused by the condition of the plugging. Men of ordinary prudence could not have reasonably supposed that they were subjecting the plaintiff to any peril in turning over to him the elevator in the condition in which they had just been using it for a week. Ordinary care does not require the anticipation of possible dangers, but only of those that usually happen or are likely to occur—

not the particular injury, but that some injury is liable to result, or will probably result. *Stone* v. *Boston, etc., R. Co.,* 171 Mass. 536, 51 N. E. 1, 5, 41 L. R. A. 794; *Norfolk & W. R. Co.* v. *Whitehurst,* 125 Va. 260, 99 S. E. 568.

[6] Neither of the plaintiff's experts had ever worked on or inspected the elevator in controversy, and neither they nor anyone else inspected the plugging after the accidents. The experts testified only as to a theory upon which the falling of the elevator might have been attributed to the plugging, but they do not give it as their opinion that the accident was in fact attributable to that cause. The servants of the security company did what reasonably prudent men would have done under like circumstances, and when the plaintiff, who had the burden of proof, failed to show that the accident was due to defective plugging done by them, there was no evidence left to support the finding of the jury. Evidence that the accident might have been caused by the defective plugging is not sufficient to support a finding that it was so caused, in the absence of any evidence to show the defective condition of the plugging at the time of the accident, and in the face of evidence that immediately after the accident the plugging operated with perfect safety and without indication of any defect.

[7] Furthermore, the plaintiff was an expert electrician, and when he saw that the elevator was being operated by ordinary inexpert workmen with the doors open, he must have known that the locks were plugged, or the wires tied up in the penhouse. He could hardly have supposed the latter from that class of workmen, but a mere glance at the door would have shown that the locks were plugged. When asked if he saw anything that morning that would put him on

notice that there was anything unusual about the equipment, he replied, "I never noticed. I was in a hurry to fix it and get back to the postoffice." If as an expert he knew that plugging was not a safe method to operate the elevator, he should have noticed, and it was negligence not to do so.

We do not think the instant case is controlled by *Pettyjohn* v. *Basham,* 126 Va. 72, 100 S. E. 813, 38 A. L. R. 391, as contended by counsel for the security company, as the facts are entirely different, nor do we think that there is anything in *City Gas Co. of Norfolk* v. *Lawrence,* 118 Va. 557, 88 S. E. 73, that is helpful to the plaintiff in error as contended by his counsel.

On the whole case, we are of opinion that the judgment of the trial court is plainly right and should be affirmed.

*Affirmed.*