COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:  Judges Friedman, Chaney and Raphael
Argued by videoconference


RACHEL DODSON, ET AL.

OPINION BY
v.      Record No. 0518-24-4          JUDGE FRANK K. FRIEDMAN
MARCH 18, 2025
RICHARD PAUL KLEFFMAN AND
 HUNTER SCOTT KLEFFMAN, CO-ADMINISTRATORS
 OF THE ESTATE OF LEANNE LOOS KLEFFMAN, DECEASED

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Petula C. Metzler, Judge

Michael E. Thorsen (Emily K. Blake; McGavin, Boyce, Bardot,
Thorsen & Katz, P.C., on briefs), for appellants.

Eugene C. Miller (Edward L. Weiner; Weiner, Spivey & Miller,
PLC, on briefs), for appellees.

This is a case about the level of guidance a supervising driver is required to offer an

inexperienced driver who is operating a vehicle under a learner's permit—and whether the

supervising driver can be held liable for a failure to properly oversee the student driver's efforts.

A 15-year-old driver, N.S., was involved in a serious accident with another vehicle which

resulted in the death of the other car's driver, Leanne Loos Kleffman. Richard Paul Kleffman

and Hunter Scott Kleffman, co-administrators of Ms. Kleffman's estate ("the Administrators")

brought suit against Rachel and John Dodson, the mother and stepfather of the young driver, for

negligent entrustment of their vehicle to N.S., and for negligence.[1] Rachel and John Dodson

appeal the circuit court's order denying their demurrer to the Administrators' amended

complaint. The Dodsons argue that the circuit court erred in denying their demurrer because

---

[1] The Administrators also sued N.S. directly.

there were no facts alleged in the amended complaint to support the negligent entrustment and negligence causes of action.

BACKGROUND[2]

Leanne Loos Kleffman, the decedent, was heading southbound on F.T. Valley Road in Rappahannock County, Virginia, when she was struck by another vehicle, operated by N.S., heading westbound on Slate Mills Road. At the time of the collision, N.S. was 15 years old and had recently obtained a learner's permit to drive. In the vehicle with N.S. were the appellants, Rachel Dodson—N.S.'s mother—and John Dodson—N.S.'s stepfather. N.S. was driving a Ford F150 pickup truck owned by the Dodsons. Also riding in the truck were N.S.'s two younger siblings.

During the drive, Rachel Dodson was sitting in the front seat of the truck, with N.S.'s younger brother sitting between her and N.S. in the driver's seat. John Dodson was a passenger in the back seat of the truck. As alleged in the amended complaint, N.S. was unfamiliar with the route, and he failed to use his turn signal and brakes when approaching the intersection where the collision took place. A stop sign was located at the intersection. The decedent died from injuries sustained in the accident.

The administrators of the decedent's estate filed the amended complaint, alleging both Rachel and John failed to properly supervise N.S.'s driving in accordance with Code § 46.2-335(A)—Counts I and III. The amended complaint also alleged that both Rachel and John Dodson negligently entrusted their Ford F150 "to an unfit driver"—Counts II and IV. Specifically, the amended complaint asserted:

> 11. Neither Rachel Dodson nor John Dodson were sitting beside
> [N.S.] as he operated the truck, and neither were alert and able to
> assist [N.S.] as he operated the truck.

---

[2] "At the demurrer stage, we must take as true all material facts properly pleaded." *Hartley v. Bd. of Supervisors*, 80 Va. App. 1, 26 (2024).

- 2 -

12. It was Rachel Dodson's intent to supervise [N.S.'s] driving at and just prior to the collision.

13. Prior to the collision, [N.S.] had never travelled that route in that direction, and was therefore unfamiliar with the location of the intersection and the stop sign at the intersection and was relying on Rachel Dodson and John Dodson to tell him where to go.

. . . .

17. Neither John Dodson nor Rachel Dodson alerted [N.S.] that the intersection was approaching and that he needed to apply his brakes to slow down his vehicle in order to stop at the stop sign before entering the intersection in time to avoid the collision.

18. John Dodson and Rachel Dodson were not alert in that they were not watching for potential danger as [N.S.] drove toward the scene of the collision.

19. John Dodson and Rachel Dodson were not paying attention to [N.S.'s] driving, were not providing him with directions, instruction or information as he drove toward the scene of the collision.

20. John Dodson and Rachel Dodson were not able to assist [N.S.] in the operation of the vehicle in that neither one of them were sitting beside [N.S.] and neither one was alert.

21. Neither John Dodson nor Rachel Dodson did or said anything to supervise [N.S.'s] operation of the truck to avoid the collision.

22. [N.S.] was an unfit driver in that he was not fully licensed to drive a motor vehicle, he had his learner's permit for only 38 days, had rarely driven the Ford F150 pickup, was not being properly supervised in that neither John Dodson nor Rachel Dodson were sitting beside him, were not alert and able to assist him, and were not paying attention to his driving, and that he was unfamiliar with the road and the route he needed to take.

23. John Dodson and Rachel Dodson knew or should have known that [N.S.] was an unfit driver yet they entrusted their motor vehicle to him.

In response to the amended complaint, the Dodsons filed a demurrer, arguing the

Administrators "failed to allege sufficient facts to state a cause of action for either common law

- 3 -

negligence or negligent entrustment[,]" and that the Administrators failed "to establish that the [Dodsons] were under a legal duty to the Administrators, either common law or statutory." The circuit court overruled the demurrer. The Dodsons filed a motion for an interlocutory appeal which the trial court certified to this Court for appeal and we granted.

ANALYSIS

"The purpose of a demurrer is to determine whether a complaint states a cause of action upon which relief may be granted." *Kellermann v. McDonough*, 278 Va. 478, 483 (2009). "Because appellate review of the sustaining of a demurrer involves a matter of law, we review the trial court's judgment *de novo*." *Glazebrook v. Bd. of Supervisors*, 266 Va. 550, 554 (2003). The Court accepts as true "all factual allegations expressly pleaded in the complaint and interpret[s] those allegations in the light most favorable to the plaintiff." *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018).

I. The Circuit Court Erred When it Found that the Administrators' Amended Complaint was Sufficient to State a Claim for Negligent Entrustment

The Dodsons argue that the circuit court erred when it overruled the demurrer as to the Administrators' claims that the Dodsons negligently entrusted their Ford F150 pickup truck to an inexperienced driver with only a learner's permit. The Administrators maintain that N.S. was an unfit driver based on his inexperience and unfamiliarity with the route traveled. Thus, they claim the Dodsons were negligent in their entrustment of the truck to him.

Our Supreme Court has specified that, to state a claim for negligent entrustment of a vehicle, "[t]he correct test of liability is whether the owner knew, or had reasonable cause to know, that he was entrusting his car to an unfit driver likely to cause injury to others." *Denby v. Davis*, 212 Va. 836, 838 (1972); *see also Hack v. Nester*, 241 Va. 499 (1990).

The General Assembly has also entered the field, with several notable pieces of legislation. Code § 8.01-64 provides that a motor vehicle owner who allows a minor under 16

- 4 -

without a learner's permit to operate the owner's vehicle is jointly and severally liable for any damages caused by the minor's negligence.[3]

Code § 46.2-335 discusses learner's permits:

§ 46.2-335. Learner's permits; fees; certification required.

A. The Department, on receiving from any Virginia resident over the age of 15 years and six months an application for a learner's permit or motorcycle learner's permit, may, subject to the applicant's satisfactory documentation of meeting the requirements of this chapter and successful completion of the written or automated knowledge and vision examinations and, in the case of a motorcycle learner's permit applicant, the automated motorcycle test, issue a permit entitling the applicant, while having the permit in his immediate possession, to drive a motor vehicle or, if the application is made for a motorcycle learner's permit, a motorcycle, on the highways, when accompanied by any licensed driver 21 years of age or older or by his parent or legal guardian, or by a brother, sister, half-brother, half-sister, step-brother, or step-sister 18 years of age or older. *The accompanying person shall be (i) alert, able to assist the driver, and actually occupying a seat beside the driver or, for motorcycle instruction, providing immediate supervision from a separate accompanying motor vehicle and (ii) lawfully permitted to operate the motor vehicle or accompanying motorcycle at that time.*

. . . .

C. No learner's permit shall authorize its holder to operate a motor vehicle with more than one passenger who is less than 21 years old, except when participating in a driver education program approved by the Department of Education or a course offered by a driver training school licensed by the Department. This passenger limitation, however, shall not apply to the members of the driver's family or household as defined in subsection B of § 46.2-334.01.

---

[3] § 8.01-64. Liability for negligence of minor.

Every owner of a motor vehicle causing or knowingly permitting a minor under the age of sixteen years who is not permitted under the provisions of § 46.2-335 to drive such a vehicle upon a highway, and any person who gives or furnishes a motor vehicle to such minor, shall be jointly or severally liable with such minor for any damages caused by the negligence of such minor in driving such vehicle.

D. No learner's permit shall authorize its holder to operate a motor vehicle between midnight and four o'clock a.m.

E. A violation of subsection C or D shall not constitute negligence, be considered in mitigation of damages of whatever nature, be admissible in evidence or be the subject of comment by counsel in any action for the recovery of damages arising out of the operation, ownership, or maintenance of a motor vehicle, nor shall anything in this subsection change any existing law, rule, or procedure pertaining to any such civil action.

. . . .

K. Any violation of this section is punishable as a Class 2 misdemeanor.

(Emphasis added). Notably, the statute states that violations of paragraphs C and D will *not* constitute negligence. It does not make the same assurance as to other subsections.

The crux of the Administrators' position, relying upon language in *Meek v. Graybeal*, 195 Va. 381 (1953), and a dissent from *Stevenson v. Falls Church*, 243 Va. 434 (1992), is that a vehicle is a dangerous instrumentality when driven by an inexperienced driver. At the same time, to become an experienced driver, one must start somewhere. The Administrators' suggestion that every newly-permitted driver is unfit would effectively override the purpose of the governing statute. Moreover, as Virginia precedent has observed, where negligent entrustment is concerned, inexperience does not necessarily equate to unfitness.

In *Turner v. Lotts*, 244 Va. 554 (1992), for example, our Supreme Court noted that "a plaintiff injured in an automobile accident [is permitted] to recover under a theory of negligent entrustment in *limited* instances." *Id*. at 558 (emphasis added). Indeed, if every time an inexperienced person drove a vehicle equated to negligent entrustment, newly-permitted drivers would never learn how to drive properly. In *Turner*, as in this case, there was no allegation of the youthful driver being "physically or mentally impaired, that he was under the influence of alcohol, . . . that the car was defective[,]" or that the driver's "license was restricted, suspended,

- 6 -

or revoked." *Id.* Due to the absence of those allegations, the Supreme Court in *Turner* held that the circuit court properly granted summary judgment for the defendants on the plaintiff's claim of negligent entrustment. *Id.*

By contrast, in *Denby*, where an owner entrusted his car to a driver who suffered from nystagmus, a defect in the eye muscles which affected the driver's ability to drive and disqualified him from obtaining a driver's license, the Supreme Court held that there was sufficient evidence for a jury to find negligent entrustment. 212 Va. at 837-38. The owner knew the driver had a disability that impaired his ability to safely operate the vehicle, and entrusted the car to him anyway. *Id.*; *see also Crowell v. Duncan*, 145 Va. 489 (1926) (finding there was sufficient evidence that defendant father negligently entrusted his vehicle to his son when father knew son often drank alcohol in excess, father allowed son to use vehicle without restriction).

No such disability is pleaded in this case. The amended complaint confirmed that N.S. had possessed a learner's permit for over a month at the time of the accident. It also specifically alleged that it was his mother's intent to supervise him on the drive. There is no claim of unfitness or impairment to the driver—other than youthful inexperience which is clearly contemplated by the learner's permit statute.

Based on Virginia precedent, we conclude that the Administrators failed to state a claim for negligent entrustment in this case. Here, the Administrators have made no allegation that N.S. was mentally or physically impaired, or that he was under the influence of mind-altering substances. Nor are there any allegations in the amended complaint that his learner's permit was restricted in any way, suspended, or revoked. The minor's use of the vehicle, accompanied by a licensed adult intending to supervise the journey, fully comported with the requirements of Code § 46.2-335(A). We hold that the circuit court erred in overruling the demurrer as to negligent entrustment, and that decision is reversed.

II. The Administrators Sufficiently Alleged a Claim of Negligence Against Rachel Dodson but Failed to State a Claim of Negligence Against John Dodson

Any "plaintiff who seeks to establish actionable negligence must plead the existence of a legal duty, violation of that duty, and proximate causation which results in injury." *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 132 (2000). "[W]hether a legal duty in tort exists is a pure question of law." *Kellermann*, 278 Va. at 487. If the duty exists, and the "allegations in a complaint are legally sufficient to establish the existence of [the] duty, then a jury, upon consideration of the evidence, must determine whether the duty has been performed." *Id.*

The amended complaint alleged that the Dodsons failed to supervise N.S.'s driving in accordance with Code § 46.2-335(A). At bottom, the claim is that the Dodsons "were not paying attention to [N.S.'s] driving."[4]

### A. Code § 46.2-335(A) Presents a Standard that an Accompanying Adult may Voluntarily Assume as a Supervising Driver

Code § 46.2-335(A) references a standard that a supervising adult is called upon to satisfy in assisting a driver with a learner's permit. Code § 46.2-335(A) explains the terms of that supervision, stating, "[t]he accompanying person shall be (i) alert, able to assist the driver, and actually occupying a seat beside the driver . . . and (ii) lawfully permitted to operate the motor vehicle[.]" In so doing, the statute makes plain that the accompanying driver must be both qualified and willing to assist the learner. As our Supreme Court observed long ago, these requirements were "obviously for the purpose that [the accompanying driver] give directions and

---

[4] The amended complaint goes on to allege that neither Rachel nor John "did or said anything to supervise" N.S., that they failed to caution him as he drove through the stop sign, and that they "were not alert and able to assist him."

exercise control if the occasion required." *Smith v. Tatum*, 199 Va. 85, 90 (1957) (applying a predecessor statute).[5]

The question before us is complicated by the fact that our Supreme Court has repeatedly declined to embrace the tort of negligent supervision, at least in an employment setting. *See A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 630 (2019) ("A.H.'s claim for negligent supervision, as a free-standing cause of action, could not survive demurrer."); *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 235 Va. 55, 61 (1988) ("In Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances and we will not create one here."); *see Eley v. Evans*, 476 F. Supp. 2d 531, 532 n.3 (E.D. Va. 2007) ("[F]ederal and Virginia courts have held that Virginia does not recognize negligent supervision as a valid cause of action."). Furthermore, the Administrators are not asserting a claim of negligence per se under Code § 46.2-335(A).[6]

---

[5] *Tatum* was decided long before the legislature added the "alertness" requirement to current Code § 46.2-335(A). In 2001, the General Assembly added the language "alert, able to assist the driver, and" to subsection A. 2001 Va. Acts chs. 659, 665. The General Assembly also added the present subsections B through E and redesignated the former subsections of B through H as present subsections F through L. *Id.* Prior to the addition, subsection A read "The accompanying person shall be (i) actually occupying a seat beside the driver or, for motorcycle instruction, providing immediate supervision from a separate accompanying motorcycle and (ii) lawfully permitted to operate the motor vehicle or accompanying motorcycle at that time." *Id.*

[6] For a claim of negligence per se, the plaintiff must allege "that the defendant violated a statute that was enacted for public safety[,]" that the plaintiff "belongs to the class of persons for whose benefit the statute was enacted, and that the harm was the type against which the statute was designed to protect[,]" and "that the statutory violation was a proximate cause of [the plaintiff's] injury." *Halterman v. Radisson Hotel Corp.*, 259 Va. 171, 176-77 (2000). While the amended complaint alleged that the Dodsons violated Code § 46.2-335(A) and that the violation was a cause of the decedent's death, the complaint does not allege that the decedent belonged "to the class of persons for whose benefit the statute was enacted, and that the harm was the type against which the statute was designed to protect." *Id.* at 176. There is no viable claim for negligence per se on these pleadings, and the Administrators have not pursued one.

The Dodsons conclude that in the absence of a negligence per se claim, and given Virginia's rejection of the negligent supervision action, there is simply no cognizable duty here that they could have breached. We disagree.

### 1. The Amended Complaint Sufficiently Alleges the Voluntary Assumption of a Duty as to Rachel Dodson

While Virginia has not specifically recognized the tort of negligent supervision, our precedent has embraced the common law principle of assumption of a duty. *Kellermann*, 278 Va. at 489-90. Accordingly, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Didato v. Strehler*, 262 Va. 617, 628 (2001) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980) (internal quotation marks omitted)).[7]

For example, in *Kellermann*, parents allowed their teenage daughter, Jaimee, to have a sleep-over at the home of her friend—with the express understanding that the girls were not to be driven by young, inexperienced male drivers during the visit. As the Court observed: "The rule [against riding with teenage male drivers] was intended for Jaimee Kellermann's safety and was a rule enforced by the Kellermanns at their home. [Mrs.] McDonough agreed and said 'don't worry, I promise we'll take good care of her,' or words to that effect." 278 Va. at 485. Instead, the girls were allowed to go to a local mall unsupervised, were driven home by a reckless young male driver who wrecked his car, killing Jaimee. When the Kellermanns sued the McDonoughs,

---

[7] As the concurrence notes, this principle has been a tenet of English common law for centuries. *See Coggs v. Bernard*, 2 Ld. Raym. 909, 92 Eng. Rep. 107 (K.B. 1703). *Coggs* held that a person who volunteered without compensation to transport barrels of brandy was liable to the owner for damages resulting from his negligent handling of the barrels which resulted in the loss of brandy. *Id.* at 919, 92 Eng. Rep. at 113 (Holt, C.J) ("[I]f a man . . . miscarries in the performance of his trust, an action will lie against him for that, though nobody could have compelled him to do the thing."). *See also* Code § 1-200 ("The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly.").

the circuit court granted the McDonoughs' demurrer based on their perceived lack of duty to prevent a third party's mischief. In ruling that the circuit court erred in granting the McDonoughs' demurrer, our Supreme Court stated: "We hold that when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care." 278 Va. at 487 (also embracing Restatement (Second) of Torts § 323).

Building on the principles enunciated in *Kellermann*, in *Burns v. Gagnon*, 283 Va. 657 (2012), a school principal was informed by a student that Gagnon (another student) was going to be attacked in a fight on school property; the principal purportedly assured the student reporting the danger that he would "alert [his] security and we'll make sure this problem gets taken care of." *Id.* at 664. The principal, Burns, however, did not act on the information, and the endangered student was beaten up. *Id.* Again, our Supreme Court found that a claim of negligence could be stated against Burns under these facts, based on the voluntary assumption of a duty. *Id.* at 673. In so doing, the Court adopted the Restatement (Second) of Torts § 324A which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 672.[8]

---

[8] The Court emphasized that Burns could only be held liable on remand if the evidence established that Burns actually accepted the duty of investigating the report and notifying security about the threat and that his failure to exercise reasonable care in doing so then met one

Here the Dodsons, much like the defendants in *Burns* and *Kellermann*, assert that the law imposes no duty on them to protect the decedent (or the world at large). Accordingly, they reason that there can be no possible cause of action by the Administrators for an abdication of the "supervising" responsibilities referenced in Code § 46.2-335(A). Extending this logic would mean that an accompanying driver could, with impunity, curl up for a catnap in the front seat and tell the student driver to take the downtown expressway to I-95 and wake up the instructor when they reach the county line liquor store. We find such an outcome to be ill-advised.

The law of torts provides a remedy for the violation of common law and statutory duties "involving the safety of persons and property, which are imposed to protect the broad interests of society." *Filak v. George*, 267 Va. 612, 618 (2004). Ultimately, it would not be pragmatic to allow an inexperienced driver to take to our crowded highways only with supervision, but then rule that the relied upon supervisor has no actual obligation to assist. Moreover, the responsibility of supervising an inexperienced driver (driving a truck with which he is unfamiliar) is necessary for the safety, not only of the young driver, but also for the passengers and for others who may be affected including the drivers of other motor vehicles—such as the decedent.

The Administrators point out that: "It cannot reasonably be argued that a 15-year-old, with little driving experience, who has just received his learner's permit, should be permitted to operate a motor vehicle . . . unsupervised." While we agree with this assessment, the governing statutes already make clear that a 15 year old is not permitted to drive unsupervised. That does not mean that any (or every) adult in a car driven by a student driver is responsible for the child's driving. The real question here is whether one who voluntarily and knowingly assumes the duty

---

or more of the prongs listed above in Restatement (Second) of Torts § 324A (a,b, & c). *Burns*, 283 Va. at 673.

- 12 -

of supervising a student driver can then be held negligent for failing to supervise the young driver in a reasonably prudent manner under the circumstances. We answer this question in the affirmative.

We are mindful that these proceedings are at the demurrer stage, where all of the Administrators' allegations (and related inferences) are taken as true. In this setting, we believe the Administrators have stated a claim that Rachel Dodson assumed a duty to supervise N.S.'s driving and negligently performed it. The amended complaint asserts that N.S. was inexperienced as a driver and was heavily relying on the accompanying driver to assist him. The pleading states that Rachel Dodson intended to supervise N.S.'s driving, but that "Rachel Dodson [was] not paying attention to [N.S.'s] driving." This inattention increased the risk and likelihood of the accident that followed. Taking all these allegations as true, we find this case fits within the *Burns-Kellermann* "assumption of duty" framework—and that the Administrators have stated a claim against Rachel Dodson.

2. By Assuming a Duty to Provide Guidance, an Accompanying Adult Does Not Become an Insurer Against any Mistake by the Student

Because this is an issue of first impression in Virginia, we will also address the Administrators' suggestion that Rachel Dodson somehow had a duty to prevent the accident and that she is naturally accountable for any errors made by her son. We find this logic unpersuasive. Instead, we agree with the guidance of the Supreme Court of North Carolina in *Stanfield v. Tilghman*, 464 S.E.2d 294 (N.C. 1995), that an accompanying driver's right to control the vehicle does not equate to a "presumption 'of control' so as to impute negligence or establish contributory negligence as a matter of law [to the accompanying driver] without regard for exigent circumstances or general negligence principles." *Id.* at 297. In *Tilghman*, a verdict was directed by the trial court against the supervising adult driver and the appellate court reversed, requiring a new trial. The appellate court observed that where the student had been

- 13 -

driving appropriately and had not required prior correction—and his subsequent error was a sudden and unanticipated one—the supervising driver could prevail before a jury by showing she was reasonably supervising under the circumstances.

Put another way, the accompanying driver is not an insurer against any possible accident; nor is she a mind-reader who can anticipate a split-second error by the student (such as mistakenly stepping on the accelerator rather than the brake); nor is she required to give a running commentary of advice throughout a properly executed journey.[9] Ultimately, if a claim is properly pleaded, the question of whether the accompanying parent negligently guided the student is a factual issue left for the jury to decide under the particular circumstances of the case. *Id.* at 298.[10] Indeed, whether Rachel, by her conduct, assumed a duty also presents a question for the factfinder. *See Burns*, 283 Va. at 672.[11] At this stage, we determine simply that in this case the Administrators' claims that Rachel intended to supervise her son, N.S. was relying on her

---

[9] In *Kellermann*, our Supreme Court was quick to point out that a "supervising parent" in a house guest setting does not become an insurer against any harm that may come to a visiting child: "such adult who agrees to supervise and care for a child upon the relinquishment of that care and supervision by the child's parent is not an insurer of the child's safety." 278 Va. at 487. Instead, "the supervising adult must discharge his or her duties as a reasonably prudent person would under similar circumstances." *Id.* Similarly, in *Burns*, the Court made clear that the school principal was *not* an insurer of the attacked student's safety—instead he could "only be held liable 'if he failed to discharge his . . . duties as a reasonably prudent person would under similar circumstances.'" 283 Va. at 671 (citations omitted). Here, too, N.S.'s mother can be found liable *if* the Administrators prove that she accepted the responsibility to supervise her son's driving, she failed to supervise him as a reasonably prudent person would have done, and that the lack of supervision was a proximate cause of the fatal wreck.

[10] Of course, when the record is further developed, if there are no material facts in dispute, summary judgment may be available. *See Turner*, 244 Va. at 557.

[11] The question of whether a legal duty exists is a question of law. *Yuzegousky v. St. John's Wood Apts.*, 261 Va. 97, 106 (2001).

supervision, and then Rachel paid no attention to N.S.'s driving are sufficient to survive the demurrer.[12]

### B. A Passenger in a Vehicle Does Not Voluntarily Assume a Duty to Instruct the Driver by Their Mere Presence in the Car

While the amended complaint asserts that Rachel sat in the front seat with N.S. and intended to supervise him, no corresponding claims are made with respect to John Dodson. At common law, a person generally does not have a duty to protect another from the conduct of third parties. *Kellerman*, 278 Va. at 492; *Burns*, 283 Va. at 668. This rule can be altered where a special relationship exists, *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 323-24 (2006), or where one voluntarily assumes a duty, *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980) ("[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all"); *see also* Restatement (Second) of Torts §§ 323, 324(A).

The *Burns-Kellermann* "assumption of duty" principle, applied here, is imposed by the common law, not the learner's permit statute—although the statute helps explain why a parent would agree to supervise a child's driving and helps set the parameters of the required guidance.[13] Here, the Administrators specifically assert that Rachel Dodson had a conscious

---

[12] We also reject the Administrators' suggestion that Rachel was negligent because she was not sitting directly beside her son. The statute requires the accompanying driver to be "beside" the student; and the second amended complaint confirms that Rachel was in the front seat with N.S. There is no requirement that the teacher be "immediately" beside the student, and we will not add language to the statutory pronouncement. *See Wakole v. Barber*, 283 Va. 488, 495 (2012) ("Courts cannot 'add language to the statute the General Assembly has not seen fit to include.'" (quoting *Jackson v. Fidelity & Deposit Co.*, 269 Va. 303, 313 (2005))). *See also Tatum*, 199 Va. at 90 (analyzing the predecessor statute as requiring the student driver "to have a licensed driver on the front seat with her").

[13] The statute, itself, does not automatically subject passengers, parents, or anyone else to the duty of supervising an inexperienced driver. For example, an adult passenger might have no idea that the driver is operating with a learner's permit.

intention of supervising her son. No similar allegations or grounds for extending or assuming a duty are pleaded with respect to John Dodson.

Since the Administrators failed to sufficiently allege the existence of a duty upon John Dodson, they similarly cannot establish a violation of any such duty or resulting proximate cause. Accordingly, the circuit court erred in overruling John Dodson's demurrer as to negligence.

CONCLUSION

We hold that the circuit court erred in denying the Dodsons' demurrer as to the Administrators' negligent entrustment claims (Counts II and IV). As to the Administrators' claims regarding negligence, we find that the circuit court properly overruled the demurrer as to Rachel Dodson (Count I), but should have sustained John Dodson's demurrer (Count III). We remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

Raphael, J., concurring.

I am pleased to join the Court's opinion. Because Rachel Dodson voluntarily assumed a duty of care to supervise her son's driving for the benefit of motorists like the decedent, Leanne Kleffman, Count I of the amended complaint states a claim against Rachel Dodson for negligence.[14]

I write separately to address appellees' first argument, on which the Court has not relied: that all persons owe a duty to the world, that is, "to mankind generally . . . not to do any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject [another person] to peril." Kleffman Br. 14 (alterations in original) (quoting *Overstreet v. Sec. Storage & Safe Deposit Co.*, 148 Va. 306, 317 (1927)). Although some of our Supreme Court's precedents support that "duty to the world" theory, it oversimplifies what has become a complicated and confusing area of tort law.

As things stand now, parties can cite Virginia Supreme Court cases for and against appellees' duty-to-the-world theory. It will require further decisions from this Court and from our Supreme Court to sort it all out. Meanwhile, I seek here to untangle several theoretical strands running through the duty element in the hope that practitioners and trial courts can better frame the issues in cases in which a tort duty has not yet been established.

I. *The common law of England that was incorporated by Virginia's reception statute did not address the duty element, which did not take root in Virginia until after the Civil War.*

There is one aspect of the duty inquiry about which everyone agrees. "The question of liability for negligence cannot arise at all until it is established that the [individual] who has been negligent owed some duty to the person who seeks to make him liable for his negligence."

---

[14] I also agree that the complaint fails to state a negligence claim against John Dodson, who is not alleged to have assumed the same duty simply because he was riding in the back seat of the family's truck when the crash happened. And I agree that the amended complaint fails to state a claim for negligent entrustment against either Mr. or Mrs. Dodson.

*Shoemaker v. Funkhouser*, 299 Va. 471, 477-78 (2021) (alteration in original) (quoting *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 277 (1991)).  "Such duty may arise from statute, from a municipal ordinance, or from the relation of the parties."  *Rice v. Turner*, 191 Va. 601, 605 (1950).

A duty of care may also be based on the "common law."  *Id.*  Naturally, that begs the question whether the common law of England that Virginia's founders adopted upon independence controls the scope of modern-day duty questions.

When the Commonwealth's founders met in May 1776, they worried that severing legal ties with England would leave a void in the body of English law to which Virginians had long grown accustomed.  The general convention of delegates enacted an "ordinance" recognizing that it would "require some considerable time to compile a body of laws suited to the circumstances of the country, and it is necessary to provide some method of preserving peace and security to the community in the mean time."  1776 Va. Acts ch. 5, § 1, *reprinted in* 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 126 (1821).  The "reception" ordinance, as it came to be known, incorporated the "common law of England" and certain acts of parliament before 1607 as the law of Virginia until changed by the legislature.  *Id*. at 127 (§ 6).[15]  In 1792, the General Assembly amended the 1776 ordinance to repeal the portion that adopted "any [English] statute or act of parliament."  1792 Va. Acts ch. 79, *reprinted in* 1 Samuel Shepherd, *Statutes at Large of Virginia* 199-200 (1835).

---

[15] Most but not all of Virginia's sister colonies adopted similar reception laws.  *See* Stuart A. Raphael, *What is the Standard for Obtaining a Preliminary Injunction in Virginia?*, 57 Univ. Rich. L. Rev. 197, 206 n.60 (2022) (collecting citations) ["Raphael"].  For a discussion about whether English law would have continued to apply in the newly independent States even without such formal reception, see *id.* at 207-08 & nn.62-69.

The common-law-reception statute has remained on our statute books ever since, appearing now at Code § 1-200.[16]  In *White v. United States*, 300 Va. 269 (2021), the Court held that the correct date by which to determine the reception of English common law was either 1776 or 1792, based on either the original ordinance or its reenactment 16 years later.[17]  *Id.* at 277 n.5. Though the choice seldom matters, our courts have not yet determined which of those two dates is correct.[18]

Unfortunately, anyone hoping for guidance from pre-1792 English common law on how to determine whether a duty exists to support a negligence claim will be disappointed. According to a recent historical survey, it was not until 1799, in *Whalley v. Wray*, 3 Esp. 74, 75, 170 Eng. Rep. 543, 543 (K.B. 1799) (Lord Eldon), that an English court "first referred to duty" in the context of a defendant's breach of duty giving rise to a negligence claim.  *See* Chris Dent, *The Introduction of Duty into English Law and the Development of the Legal Subject*, 40 Oxford J. Legal Studies 158, 161 & n.23 (2020).[19]  Indeed, the law of negligence only "took shape as a

---

[16] Code § 1-200 currently provides: "The common law of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly."

[17] *White* overruled in part the Court's 2011 decision in *Commonwealth v. Morris*, 281 Va. 70, 81-82 (2011), which had held that the correct date was 1607.  *See White*, 300 Va. at 277 n.5. *See also* Raphael, *supra* at 208-09 & nn.73-75 (describing how "the clumsy wording" of the original language referencing acts of parliament as of "the fourth year of the reign of King James I"—adopted in Virginia and copied by several other States—misled several courts into choosing 1607 as the relevant date).

[18] *See, e.g.*, *Respess v. VMI Alumni Ass'n*, 81 Va. App. 141, 146 (2024) ("Although we have noted the 'continuing uncertainty about whether 1776 or 1792 "fixes the date of the Commonwealth's adoption of English common law,"' that date does not matter here." (quoting *Butler v. Stegmaier*, 77 Va. App. 115, 135 (2023))).

[19] Dent noted that whether Lord Eldon actually used the term "duty" was open to "'doubt and hesitation,'" owing to the relatively poor reputation of "Espinasse's reports."  Dent, *supra*, at 161 n.23 (quoting *Small v. Nairne*, 13 Q.B. 840, 844, 116 Eng. Rep. 1484, 1486 (K.B. 1849) (Denman, C.J.)).  A 1796 case not cited by Dent (but likewise reported by Espinasse) also used

separate tort . . . during the earlier part of the *nineteenth century*," W. Page Keeton et al., *Prosser & Keeton on Torts* 160 (5th ed. 1984) (emphasis added) ["Prosser & Keeton"], decades after our reception statute had incorporated then-extant English common law.[20]

Dean Prosser credited three English cases between 1837 and 1842 for that development. *Id.* at 357. Professor Ibbetson, in turn, has traced the "classic definition" of duty to an 1862 opinion that was "not itself a case of negligence." David J. Ibbetson, *The Tort of Negligence in the Common Law in the Nineteenth and Twentieth Centuries*, *in Negligence: The Comparative Legal History of the Law of Torts* 234 (Eltjo J.H. Schrage ed. 2001) ["Ibbetson"]. In *Swan v. North British Australasian Co.*, 7 H. & N. 603, 158 Eng. Rep. 611 (Ex. 1862), Baron Wilde wrote that "[t]he action for negligence proceeds from the idea of an obligation towards the plaintiff to use care, and a breach of that obligation to the plaintiff's injury." *Id.* at 636, 158 Eng. Rep. at 625.

That idea took root in America as well. "By the time of the first substantial treatments of negligence liability in America, around 1870, the central function of the duty of care, and with it the classic structure of negligence, was clearly established." Ibbetson, *supra*, at 235. That was true in Virginia. In the mid-nineteenth century, our Supreme Court (before 1971 called the Supreme Court of Appeals of Virginia) used the idea of "duty" to describe the obligations of certain public trades. In 1857, the Court held that a heightened duty of care applied to stage-coach operators, making them "liable for personal wrongs and injuries arising from slight

*duty* in the context of a claim against the owner of a vicious dog. *See Jones v. Perry*, 2 Esp. 482, 483, 170 Eng. Rep. 427, 428 (K.B. 1796) (Lord Kenyon) ("Report had said the dog had been bitten by a mad dog; it became *the duty of the defendant* to be very circumspect. . . . He ought to use such [precaution] as would put it out of the animal's power to do hurt." (emphasis added)).

[20] *See also* Percy H. Winfield, *Duty in Tortious Negligence*, 34 Col. L. Rev. 41, 65 (1934) ("The idea of duty as a consciously technical term was quite unknown in the earlier law of negligence, and did not emerge as such until near the middle of the nineteenth century.").

neglect." *Farish v. Reigle*, 52 Va. (11 Gratt.) 697, 709 (1854). The duty recognized in *Farish* was later extended to "common carrier" railroads. *See, e.g.*, *Richmond City Ry. Co. v. Scott*, 86 Va. 902, 907 (1890). In 1877, the Court said that wharf operators serving the public were "bound to use at least ordinary care and diligence in keeping the water adjacent to such wharf . . . free from obstructions, and [are] liable for any damage done to any such vessel by reason of the neglect of such duty." *City of Petersburg v. Applegarth*, 69 Va. (28 Gratt.) 321, 339 (1877).

Shearman and Redfield's treatise, first published in 1869, explained that "whether a party has been negligent in a particular case[] is one of mingled law and fact," consisting of two inquiries: "(1) Whether a particular act has been performed or omitted, and (2) whether the performance or omission of this act was a breach of a legal duty. The first of these is a pure question of fact, the second a pure question of law." Thomas G. Shearman & Amasa A. Redfield, *A Treatise on the Law of Negligence* § 11, at 8-9 (1869). One of the early Virginia cases to incorporate the duty requirement as an element of a negligence claim quoted that passage to show the respective roles of the judge and jury. *See Baltimore & Ohio R.R. Co. v. McKenzie*, 81 Va. 71, 82 (1885).

Other American treatises followed in short order that our Supreme Court would also cite as authoritative:

- In 1888, the second edition of Cooley's treatise said that the "first requisite in establishing negligence is to show the existence of the duty which it is supposed has not been performed." Thomas M. Cooley, *Treatise on the Law of Torts, or the Wrongs Which Arise Independent of Contract* 791 (2d ed. 1888). Cooley added that "a duty owing to everybody can never become the foundation of an action until some individual is placed in position [that] gives him particular occasion to insist upon its performance: it then becomes a duty to him personally." *Id.* at 792.

- In 1889, Bishop's treatise advised that "however great the defendant's negligence, if it was committed without violating any duty [that] he owed[,] . . . there is nothing [that] the law will redress." Joel Prentiss Bishop, *Commentaries on the Non-Contract Law and Especially as to Common Affairs Not of Contract of the Every-Day Rights and Torts* § 446, at 199 (1889).

- 21 -

- In 1895, Jaggard's treatise advised, "While there may be some . . . difference[s] in the various definitions of 'negligence,' all the authorities agree that its essential element consists in a breach of duty" and that "the plaintiff must state and prove facts sufficient to show what that duty is, and that the defendant owes it to him." 2 Edwin A. Jaggard, *Hand-Book of the Law of Torts* 826 (1895).

- In 1898, Shearman and Redmond advised in their fifth edition that duty is "an essential element of negligence. . . . If there is no duty, there can be no negligence." 1 Thomas G. Shearman & Amasa A. Redfield, *A Treatise on the Law of Negligence* § 8, at 6-7 (5th ed. 1898).

Citing each of those passages, our Supreme Court in *Norfolk & Western Railway Co. v. Wood*, 99 Va. 156 (1901), held that "[a]n action for negligence only lies where there has been a failure to discharge a legal duty. . . . The duty must be due to the party injured, and the declaration must show this." *Id.* at 158-59.

Duty thus became a key element of the cause of action for negligence in Virginia and remains so today. *Compare Stephens v. Va. Elec. & Power Co.*, 184 Va. 94, 99 (1945) ("necessary . . . to show that the defendant breached a duty [that] it owed her . . . for actionable negligence implies a duty, a violation thereof, and a consequent injury"), *with Collett v. Cordovana*, 290 Va. 139, 146 (2015) ("A plaintiff who seeks to establish actionable negligence must plead the existence of a legal duty, violation of that duty, and proximate causation [that] results in injury." (quoting *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 132 (2000))).

II. *The duty doctrine ripens in the 19th and 20th centuries.*

But how should a court determine whether the defendant in a particular case owed a duty of care to the plaintiff? To understand how Virginia cases answered that question after *Wood*, it helps to understand how the law of duty developed in England and the United States.[21]

---

[21] *See* Ibbetson, *supra*, at 231 n.1 (noting that the negligence cause of action "is very much a product of Anglo-American (and not just English) Law: there is considerable transnational citation of cases . . . and cross-fertilisation among academic writers").

*A. Duty in the context of the defendant's inaction*

One consistent throughline in the law of negligence has been the "distinction between action and inaction." Prosser & Keeton, *supra*, at 373. "Hence[,] there arose very early a difference deeply rooted in the law of negligence, between 'misfeasance' and 'nonfeasance'— that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm." *Id.* As England's Court of Common Pleas put it in 1867, "[n]o action will lie against a spiteful man who, seeing another running into a position of danger, merely omits to warn him." *Gautret v. Egerton*, L.R. 2 C.P. 370, 375 (1867) (Willes, J.). To turn such inaction into liability, "some wrongful act must be shown, or a breach of some positive duty." *Id.*[22]

In the United States, all three iterations of the Restatement of Torts have maintained that approach, making clear that no duty exists to protect a plaintiff from harm caused by some other person or thing absent an affirmative duty recognized by law. "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement (Second) of Torts § 314 (Am. L. Inst. 1965); *see also* Restatement of Torts § 314 (Am. L. Inst. 1934) (using substantially similar language). In the context of inaction, "negligent conduct" means "a failure to do an act [that] is necessary for the protection or assistance of another *and which the actor is under a duty to do*." Restatement (Second) of Torts § 284(b) (emphasis added); Restatement of Torts § 284(b) (substantially similar language). Both the first and second Restatements enumerated various affirmative duties. *See* Restatement (Second) of Torts §§ 314-324A, 329-387; Restatement of Torts §§ 314-324, 329-387.

---

[22] Dean Prosser put it more brutally: "The expert swimmer, with a boat at hand, who sees another drowning before his eyes, may sit on the dock, smoke his pipe, and watch him drown." William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 16 (1953).

The Restatement (Third) takes a similar approach: "An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38-44 is applicable." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (Am. L. Inst. 2012) ["Restatement (Third)"]. Affirmative duties include those based on a "special relationship" (§§ 40-41) or voluntary undertaking (§§ 42-43).[23]

Virginia has generally followed the same approach, providing a default rule that no duty exists to prevent harm caused by some other thing or someone else, with exceptions for cases where a special relationship exists or the defendant voluntarily assumed a duty. *See A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 618-23 (2019). Still, our Supreme Court has declined to recognize some of the affirmative duties that have appeared in the Restatement. The Court rejected § 317 of the Restatement (Second), which would impose on an employer a duty of ordinary care "to prevent [his employee] from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them." *Id.* at 622.[24] The Court likewise rejected § 316, which would impose on a parent the

> duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent (a) knows or has reason to know that he has the ability to control his child, and (b) knows or should know of the necessity and opportunity for exercising such control.

---

[23] *But see* Victor E. Schwartz & Christopher E. Appel, *Reshaping the Traditional Limits of Affirmative Duties Under the Third Restatement of Torts*, 44 John Marshall L. Rev. 319 (2011) (arguing that several provisions of the Restatement (Third) establish affirmative duties extending beyond those recognized in the Restatement (Second)).

[24] Section 317 corresponds to § 41(b)(3) of the Restatement (Third). *See* Restatement (Third), *supra*, § 41(b)(3) & cmt. e.

*See Bell v. Hudgins*, 232 Va. 491, 493-94 (1987).[25] The Court (4-3) also rejected § 363(2), which would impose on the "possessor of land in an urban area . . . liability to persons using a public highway for physical harm resulting from his failure to exercise reasonable care to prevent an unreasonable risk of harm arising from the condition of trees on the land near the highway." *Compare Cline v. Dunlora S., LLC*, 284 Va. 102, 110 (2012) ("[T]his Court has never recognized, nor do our precedents support, a ruling that a landowner owes a duty to protect travelers on an adjoining public roadway from natural conditions on his or her land."), *with id.* at 111-12 (Lemons, J., dissenting) (advocating the rule in § 363(2) of the Restatement (Second) of Torts).

### B. *Duty in the context of a defendant's affirmative conduct or misfeasance*

While the framework for determining duty in the context of a defendant's inaction or nonfeasance has been comparatively stable, determining when a duty exists in the context of harm caused by the defendant's affirmative conduct or misfeasance has been more controversial. At least four discernable models have been used in England and the United States over the past 150 years:

- The zone-of-danger model, articulated by Judge Cardozo in his majority opinion in *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1927), and earlier by Judge Brett in *Heaven v. Pender*, 11 Q.B.D. 503 (1883);

- The duty-to-the-world model, articulated by Judge Andrews in his dissent in *Palsgraf*;

- The Prosser (Green) model, a multifactor approach to determining duty now followed by most States; and

- The Restatement (Third) approach, a version of the Judge Andrews duty-to-the-world approach that allows for no-duty determinations based on explicit policy considerations.

---

[25] Section 316 corresponds to § 41(b)(1) of the Restatement (Third). *See* Restatement (Third), *supra*, § 41(b)(1) & cmt. d.

As our Supreme Court at times has borrowed from each of these models, understanding them helps untangle the conflicting strands in Virginia precedent.

### 1. The zone-of-danger test

The first jurist widely credited with creating the zone-of-danger test was England's Sir William Brett, in *Heaven v. Pender*, 11 Q.B.D. 503 (1883). *See* Prosser & Keeton, *supra*, at 358; Leon Green, *The Duty Problem in Negligence Cases*, 28 Col. L. Rev. 1014, 1028 (1928) [Green]. Judge Brett was then serving as the Master of the Rolls, the head of the civil division of England's Court of Appeal. He would later be elevated to the House of Lords, becoming known as Lord Esher. The Court of Appeal in *Heaven* held that the plaintiff, a ship painter, stated a negligence claim against the defendant dock owner that had supplied defective staging ropes from which the plaintiff fell while trying to access the vessel. 11 Q.B.D. at 514 (Brett, M.R.), 517 (Cotton, L.J.).

But the panel could not agree on the rationale for imposing a duty of care on the dock owner. Judge Brett alone theorized a broad conception of duty that he thought explained "all the recognised cases of liability." *Id.* at 509. That is,

> whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognise that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.

*Id.* This approach "c[a]me to be known as the 'danger' test." *Green*, supra, at 1029. As Professor Green explained nearly a century ago, "this formula is identical with the 'foreseeability' or 'anticipation of harm' formula." *Id.*[26]

---

[26] The two other judges disagreed. Lord Judges Cotton and Bowen concluded that the workers "who came to the vessels for the purpose of painting and otherwise repairing them were there" for the dock owner's business and so "must be considered as invited by the dock owner to use the dock." *Heaven*, 11 Q.B.D. at 515 (Cotton, L.J.). The dock owner was thus "under an

The zone-of-danger test for duty was more famously articulated by Judge Cardozo in *Palsgraf*, perhaps the most influential case in American tort law, still read by first-year-law students.[27] The court there set aside a jury verdict for Helen Palsgraf against the Long Island Railroad for injuries she suffered when a large "scale" hit her as she was standing at one end of a train platform.[28] *Palsgraf*, 162 N.E. at 99, 101. The scale was moved by the force of an explosion emanating from the other end of the platform. The explosion happened when a railroad employee haplessly tried to help a passenger board a train, thereby dislodging a newspaper-wrapped package of fireworks that the passenger was carrying. When the package hit

---

obligation to take reasonable care that . . . the appliances provided for immediate use . . . were in a fit state to be used." *Id.* Those judges were "unwilling to concur with the Master of the Rolls in laying down unnecessarily the larger principle [that] he entertains, inasmuch as there are many cases in which the principle was impliedly negatived." *Id.* at 516. The Law Journal of the day called Judge Brett's theory of duty "a bold proposition, from which it is no wonder that the Lords Justices somewhat shrank. . . . [S]o wide is its area that it is difficult to say what cases of liability it would not cover." *The Duty of Care Towards One's Neighbour*, 18 L.J. 618, 619 (1883). But Judge Brett did not agree that his theory was so uncabined. Ten years later, Judge Brett, having been elevated to the peerage as Lord Escher, wrote that "[t]he question of liability for negligence cannot arise at all until it is established that the man who has been negligent owed some duty to the person who seeks to make him liable for his negligence." *Le Lievre v. Gould*, 1 Q.B. 491, 497 (1893). "A man is entitled to be as negligent as he pleases towards the whole world if he owes no duty to them." *Id.*

[27] Dean Prosser called *Palsgraf* "the most celebrated of all tort cases." *Palsgraf Revisited*, *supra*, at 1.

[28] The "scale involved in *Palsgraf* was a lollipop type, so called because of its shape." William H. Manz, *Palsgraf: Cardozo's Urban Legend*, 107 Dick. L. Rev. 785, 826 (2003); *Palsgraf Revisited*, 52 Mich. L. Rev. at n.9 (stating that "the scale "was evidently an ordinary penny scale of the railroad platform type, with a mirror, standing as high as Mrs. Palsgraf's head. She testified that there was 'flying glass,' and her daughter said that she heard the scale 'blow apart.'" (citations omitted)). During the 1920s, "penny-in-slot or coin-controlled scales [were] found in operation in almost every advantageous location in almost every town and city in the country." Bureau of Standards, United States Dep't of Commerce, *Report of the Twenty-Second National Conference on Weights and Measures* 128 (1929) (statement of George M. Roberts, Superintendent of Weights, Measures, and Markets, District of Columbia). The now-forgotten prevalence of penny scales has led some modern commentators to misdescribe the scale in *Palsgraf* as "roof tiles." Edward S. Adams et al., *At the End of Palsgraf, There is Chaos: An Assessment of Proximate Cause in Light of Chaos Theory*, 59 U. Pitt. L. Rev. 507, 508 (1998).

the ground, the fireworks exploded and the blast caused the scale at the other end of the platform to strike Mrs. Palsgraf.  *Id.* at 99.

Writing for the majority, Judge Cardozo reasoned that the train employee owed no duty to Mrs. Palsgraf, who stood at the other end of the platform.  *Id.* at 99-101.  Citing our Supreme Court's 1901 decision in *Wood* and the same treatises on which *Wood* had relied (Shearman & Redfield, Cooley, Jaggard), the court took it as a given that the plaintiff must show that the defendant owed a duty to the plaintiff: "[t]he plaintiff sues in her own right for a wrong personal to her, and not as the vicarious beneficiary of a breach of duty to another."  *Id.* at 100.  But Mrs. Palsgraf was too far away for the duty to be owed to her:

> The conduct of the defendant's guard, if a wrong in its relation to the holder of the package, was not a wrong in its relation to the plaintiff, standing far away.  Relatively to her it was not negligence at all.  Nothing in the situation gave notice that the falling package had in it the potency of peril to persons thus removed.  Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right.  "Proof of negligence in the air, so to speak, will not do."

*Id.* at 99 (quoting Frederick Pollock, *The Law of Torts: A Treatise on the Principles of Obligations Arising from Civil Wrongs in the Common Law* 455 (11th ed. 1920)).  "Here, by concession, there was nothing in the situation to suggest to the most cautious mind that the parcel wrapped in newspaper would spread wreckage through the station."  *Id.* at 101.  "Negligence, like risk, is thus a term of relation.  Negligence in the abstract, apart from things related, is surely not a tort . . . ."  *Id.  Cf. Le Lievre v. Gould*, 1 Q.B. 491, 497 (1893) ("A man is entitled to be as negligent as he pleases towards the whole world if he owes no duty to them.").

Judge Cardozo did not elaborate much on *when* a duty arises.  But he had two considerations in mind.  The first was the "relation" between the plaintiff and the defendant, a term he used six times.  *Palsgraf*, 162 N.E. at 99-101.  The second was whether the harm that materialized should have been reasonably foreseeable to the defendant.  To be sure, the opinion

- 28 -

did not use the term "foreseeable" or "foreseeability." But that must have been what he meant by statements like:

- "no hazard was *apparent to the eye* of ordinary vigilance," *id.* at 99 (emphasis added);

- "the orbit of the danger as disclosed *to the eye of reasonable vigilance* would be the orbit of the duty," *id.* at 100 (emphasis added);

- "Negligent the act is . . . only because *the eye of vigilance perceives the risk* of damage," *id.* (emphasis added); and

- "there was nothing in the situation to suggest to the most cautious mind that the parcel wrapped in newspaper would spread wreckage through the station," *id.* at 101.

Shortly after the opinion in *Palsgraf* was released, Professor Green recognized Judge Cardozo's theory of duty as continuing Judge Brett's "'danger' test" from *Heaven*. *See* Green, *supra*, at 1031. Indeed, in his earlier opinion for the court in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382 (N.Y. 1916), Judge Cardozo had expressly relied on Judge Brett's theory of duty, quoting the same passage from *Heaven v. Pender* set out above. *Id.* at 388. Under Cardozo's approach, when "the danger is to be foreseen, there is a duty to avoid the injury." *Id.* at 385. "If [the defendant] is negligent, where danger is to be foreseen, a liability will follow." *Id.* at 390. *See also Glanzer v. Shepard*, 135 N.E. 275 (N.Y. 1922) (Opinion of Cardozo, J.) ("Constantly the bounds of duty are enlarged by knowledge of a prospective use.").

2. The duty-to-the-world model

The dissent in *Palsgraf* rejected that approach to determining duty. 162 N.E. at 101 (Andrews, J., dissenting). To Judge Andrews, negligence was not "a relative concept—the breach of some duty owing to a particular person or to particular persons." *Id.* at 102. Instead, when the defendant's conduct "unreasonably threatens the safety of others . . . the doer [should be] liable for all its proximate consequences, even where they result in injury to one who would

- 29 -

generally be thought to be outside the radius of danger." *Id.* Judge Andrews articulated a duty-to-the-world theory:

> The proposition is this. Every one owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others. Such an act occurs. Not only is he wronged to whom harm might reasonably be expected to result, but he also who is in fact injured, even if he be outside what would generally be thought the danger zone. . . . Harm to some one being the natural result of the act, not only that one alone, but all those in fact injured may complain.

*Id.* at 103. Judge Andrews allowed "one limitation" on the scope of liability: the "damages must be so connected with the negligence that the latter may be said to be the proximate cause of the former." *Id.* But such attenuation was a question "of proximate cause, not of negligence." *Id.* at 102. Proximate cause was a question of fact for the jury, and the jury there had resolved the issue favorably for Mrs. Palsgraf. *Id.* at 103. So Judge Andrews would have affirmed the judgment. *Id.*

Courts determine as matter of law whether a duty exists, *e.g.*, *Shoemaker*, 299 Va. at 478, while juries generally determine proximate cause, *e.g.*, *Bon-Secours-Depaul Med. Ctr., Inc. v. Rogakos-Russell*, ___ Va. ___, ___ (Jan. 2, 2025). Thus, the choice between Judge Cardozo's approach and that of Judge Andrews directly affects whether negligence cases get resolved by judges or juries.[29]

---

[29] *See, e.g.*, David G. Owen, *Figuring Foreseeability*, 44 Wake Forest L. Rev. 1277, 1301 (2009) ["Owen"] ("How strongly duty rules are framed controls the extent to which negligence lawsuits of various types are approved for full adjudication or are instead summarily ejected from the judicial system. Weaker no-duty rules funnel more disputes at the margin of negligence law into local courtrooms for possible redress, while stronger no-duty rules force the victims of such disputes to absorb their injuries themselves or seek relief from insurance providers and other institutions beyond the courts.").

### 3. The policy-driven concept of duty

Professor Green gently criticized Cardozo's view of duty as too narrow, arguing that additional policy considerations beyond foreseeability should inform whether to recognize a duty. *See* Green, *supra*, at 1031-32. Dean Prosser agreed, concluding that "'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Prosser & Keeton, *supra*, at 358.

> [A]s our ideas of human relations change[,] the law as to duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties.

*Id.* at 359 (footnotes omitted); *see also* William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 15 (1953) ("In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'" (quoting *Palsgraf*, 162 N.E. at 104 (Andrews, J., dissenting)).

The Prosser (Green) model has since been followed by courts in most States. In his 1997 survey, Professor Lake found that "an overwhelming majority of American jurisdictions treat[ed] questions of duty in negligence law substantially in terms . . . [of] the Prosser (Green) approach," meaning "policy-based, multi-factor balancing tests." Peter F. Lake, *Common Law Duty in Negligence Law: the Recent Consolidation of a Majority Position*, 34 San Diego L. Rev. 1503, 1505 (1997) ["Lake"]. Lake identified Virginia as the outlier. *See id.* at 1523 ("No major jurisdiction, except perhaps Virginia, has avoided the clear movement of American common law tort law."); *id.* at 1566 ("The Virginia Supreme Court has not adopted a Prosser (Green)

approach and has only made passing reference to policies [that] may be used in its duty determinations." (citing *Dudley*, 241 Va. at 883)).

In his 2011 survey of 51 American jurisdictions, Professor Cardi identified—astonishingly—42 factors, "[a] near comprehensive list," that courts in various States had considered when determining whether to recognize a duty of care. W. Jonathan Cardi, *The Hidden Legacy of Palsgraf: Modern Duty Law in Microcosm*, 91 B.U. L. Rev. 1873, 1883-84 (2011).[30] Of the 43 jurisdictions that used "a multi-factorial policy analysis as the core of duty,"

---

[30] The 42 factors were:

> (1) the foreseeability of some general risk of harm, (2) the foreseeability of the harm that in fact materialized, (3) the relationship between the parties, (4) the nature of the activity in which the defendant engaged, (5) the type of injury risked by the defendant's conduct, (6) the nature of the plaintiff's injured interest, (7) the social utility of the defendant's conduct, (8) the burden on the defendant of taking precautions against the risk, (9) the defendant's ability to exercise due care, (10) the consequences on society of imposing the burden on the defendant, (11) public policy, (12) the normal expectations of participants in the defendant's activity, (13) the expectations of the parties and of society, (14) the goal of preventing future injuries by deterring conduct in which the defendant engaged, (15) the desire to avoid an increase in litigation, (16) the decisions of other jurisdictions, (17) the balance of the foreseeable risk of injury versus the burden of preventing it (i.e., the Learned Hand formula), (18) fairness, (19) logic and science, (20) the desire to limit the consequences of wrongs (expressed in New York as the desire to curb the likelihood of unlimited or insurer-like liability), (21) the hand of history, (22) ideals of morality and justice, (23) the convenience of administration of the resulting rule, (24) social ideas about where the plaintiff's loss should fall, (25) whether there is social consensus that the plaintiff's asserted interest is worthy of protection, (26) community mores, (27) whether the injury is too remote from the defendant's conduct, (28) whether the injury is out of proportion to the defendant's wrong, (29) whether the imposition of a duty would open the way to fraudulent claims, (30) whether the recognition of a duty would enter a field with no sensible stopping point, (31) the cost and ability to spread the risk of loss, (32) the court's experience, (33) the desire for a reliable, predictable, and consistent body of law, (34) public policies regarding the expansion or limitation of new channels of liability, (35) the potential for disproportionate risk and reparation allocation, (36)

foreseeability was "nearly ubiquitous and often cited as the most important factor." *Id.* at 1884.

"The next most frequently [] cited factor" was "the open-ended consideration of 'public policy.'"

*Id.* at 1887. The "relationship between the parties" factor originating in *Palsgraf* came in as "a

distant third." *Id.* Cardi concluded that, "[o]n the theoretical substance of duty, neither the

vision of Cardozo nor of Andrews dominates today's courts. Instead, courts embrace Prosser's

aphorism that duty 'is only an expression of the sum total of those considerations of policy which

lead the law to say that the plaintiff is entitled to protection.'" *Id.* at 1913.

4. The Restatement (Third)—duty is presumed unless negated for public-policy reasons.

In 2010, the Restatement (Third) advanced a fourth model to establish duty in the context

of a defendant's affirmative conduct or misfeasance:

§ 7. Duty

(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.

(b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

Restatement (Third), *supra*, § 7. Section 7(a) thus creates a default rule establishing the actor's

duty whenever his conduct "creates a risk of physical harm." That default rule dovetails with

§ 6, which says that "[a]n actor whose negligence is a factual cause of physical harm is subject to

---

whether one party had superior knowledge of the relevant risks, (37) whether either party had the right to control or had actual control over the instrumentality of harm, (38) the degree of certainty that the plaintiff suffered injury, (39) the moral blame attached to the defendant's conduct, (40) the foreseeability of the plaintiff, (41) economic factors, and (42) a consideration of which party could better bear the loss.

91 B.U. L. Rev. at 1883-84.

liability for any such harm within the scope of liability, unless the court determines that the ordinary duty of reasonable care is inapplicable." As a result, "[i]n most cases, courts can rely directly on § 6 and need not refer to duty on a case-by-case basis." *Id.* § 7 cmt. a.

But there can be exceptions. Section 7(b) addresses carve-outs where, for "some categories of cases, reasons of principle or policy dictate that liability should not be imposed. In these cases, courts use the rubric of duty to apply general categorical rules withholding liability." *Id.*

By creating a default rule in § 7(a) that duty attaches whenever the actor's conduct creates a risk of physical harm to another, the Restatement (Third) eliminates foreseeability entirely as a duty consideration. *Id.* cmt. j. If a court determines that a no-duty rule is appropriate for policy reasons, that "ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care." *Id.* Those "reasons of policy and principle do not depend on the foreseeability of harm based on the specific facts of a case." *Id.* Foreseeability remains "an element in the determination of negligence." *Id.* Foreseeability also remains a consideration in evaluating proximate cause, which the Restatement (Third) renames as "scope of liability." *See* Restatement (Third), *supra*, Ch. 6, Special Note on Proximate Cause & § 29 cmt. e. By disapproving the use of foreseeability in no-duty determinations, the drafters hope to "facilitate more transparent explanations of the reasons for a no-duty ruling and to protect the traditional function of the jury as factfinder." *Id.* § 7 cmt. j.

As Professor Kaye has observed, § 7(a) of the Restatement (Third) "completely rejects [Judge] Cardozo's approach and instead adopts Judge Andrews's minority opinion that presupposes that everyone owes a duty of care to others, except when Section 7(b) says that they do not." Tim Kaye, *The Identity Criterion: Resuscitating a Cardozian, Relational Approach to*

*Duty of Care in Negligence*, 49 Hofstra L. Rev. 945, 947 (2021). Kaye criticizes that approach.

He notes that the drafters of the § 7(b) carve-out were "unable to say, as a general matter, what

such countervailing principles or policies might be[,] . . . a bizarre way to treat such a

foundational doctrine as duty of care." *Id.*

The fate of the Restatement (Third) approach remains uncertain. A handful of States

have adopted the approach in § 7.[31] Others have declined to do so.[32] Academic commentary has

offered both praise[33] and criticism of the Restatement (Third)'s decision to establish duty as a

default rule and to eliminate foreseeability as part of the duty analysis.[34]

---

[31] *See Thompson v. Kaczinski*, 774 N.W.2d 829, 834-35 (Iowa 2009); *A.W. v. Lancaster Cty. Sch. Dist.*, 784 N.W.2d 907, 914-18 (Neb. 2010); *Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 326 P.3d 465, 467 (N.M. 2014).

[32] *See Quiroz v. Alcoa Inc.*, 416 P.3d 824, 840-43 (Ariz. 2018); *Riedel v. ICI Americas Inc.*, 968 A.2d 17, 21 (Del. 2009), *overruled in part on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1262 (Del. 2018); *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 389 (Ind. 2016); *Manley v. Hallbauer*, 423 P.3d 480, 486 (Kan. 2018); *Snow v. TravelCenters of Am. LLC*, 527 P.3d 741, 749 (Okla. Civ. App. 2022).

[33] *E.g.*, Timothy Lockwood Kelly, *The Third Restatement and the Jurisprudential Evolution of Duty: Tracking the "Duty War" in Palsgraf and Beyond (With a Focus on the Influence of H.L.A. Hart)*, 13 Drexel L. Rev. 87, 141 (2020) ("The points that can be made against [the Restatement (Third)] do not clearly prevail over those in its favor . . . ."); W. Jonathan Cardi & Michael D. Green, *Duty Wars*, 81 S. Cal. L. Rev. 671, 726-33 (2008) (arguing that the Restatement (Third)'s approach provides clearer guidance to courts and properly leaves fact-intensive questions to the jury, including questions of foreseeability); W. Jonathan Cardi, *Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts*, 58 Vand. L. Rev. 739, 790-808 (2005) (arguing that adopting § 7 will advance the rule of law and properly leave fact-bound foreseeability issues to be resolved by the trier of fact).

[34] *E.g.*, Alani Golanski, *A New Look at Duty in Tort Law: Rehabilitating Foreseeability and Related Themes*, 75 Alb. L. Rev. 227, 266-75 (2011-12) (arguing that the Restatement (Third)'s purging of foreseeability from the duty inquiry is incoherent); Owen, *supra*, at 1304-06 (criticizing Restatement (Third)'s rejection of foreseeability in duty analysis, arguing that "duty (and no-duty) rulings by courts contain much more intrinsic power than do breach and proximate cause rulings, for duty rulings far more prominently telegraph rules across the legal landscape that help lawyers and their clients understand the law"); Jane Stapleton, *The Risk Architecture of the Restatement (Third) of Torts*, 44 Wake Forest L. Rev. 1309, 1332 (2009) (criticizing lack of clarity and precision in the "risk architecture" of the Restatement (Third)); Benjamin C.

*III. At various times, our Supreme Court has followed each of those models.*

It is easier to describe the landscape of duty law than to say precisely where Virginia now

fits within it.  Our Supreme Court has followed more than one approach.

*A. Cases following the zone-of-danger approach*

The zone-of-danger approach taken by Judge Brett in *Heaven* and Judge Cardozo in

*Palsgraf* appears in various Virginia precedents.  In 1904, our Supreme Court expressly invoked

Brett's opinion to explain why an oil-company shipper was liable for the death of a railway

worker who was killed while unloading a tanker car that had a defective release valve:

> The reason upon which the rule . . . is based is clearly and strongly
> stated by Brett, M.R. (afterwards Lord Esher), in his dissenting
> opinion in *Heaven v. Pender*, L.R. 11 QB 503. . . .  "[W]henever
> one person is by circumstances placed in such a position with
> regard to another that every one of ordinary sense who did think
> would at once recognize that if he did not use ordinary care and
> skill in his own conduct with regard to those circumstances, he
> would cause danger of injury to the person or the property of the
> other, a duty arises to use ordinary care and skill to avoid such
> injury."

*Standard Oil Co. v. Wakefield*, 102 Va. 824, 831-32 (1904) (quoting *Heaven*, 11 Q.B.D. at 503

(Brett, M.R.)).

Zipursky, *Foreseeability in Breach, Duty, and Proximate Cause*, 44 Wake Forest L. Rev. 1247, 1257-58 (2009) ("The Reporters risk damaging the credibility of the *Restatement (Third)* as a 'restatement' by declining to put foreseeability in the black letter of section 7. . . .  The problem is what is missing: the statement that almost every jurisdiction does treat foreseeability as a significant factor (and frequently the most significant factor) in analyzing whether the duty element is met in a negligence claim."); *id.* at 1263 (arguing that the Reporters, having banished foreseeability from the duty inquiry in § 7(a), fail to explain why "categorial foreseeability considerations" could not be a part of no-duty determinations under § 7(b)); Joseph W. Little, *Palsgraf Revisited (Again)*, 6 Pierce L. Rev. 75, 107 (2007) ("[T]he new Restatement's position on the use of foreseeability in the law of torts is not supported by the law most American courts apply and does not provide a more desirable alternative."); John C. P. Goldberg & Benjamin C. Zipursky, *The Restatement (Third) and the Place of Duty in Negligence Law*, 54 Vand. L. Rev. 657, 697 (2001) (arguing that the Restatement (Third)'s treatment of duty fails to "restate the law" and instead attempts to "recast it completely").

In 1927, the Court in *Overstreet* quoted an Oklahoma case for a proposition sounding remarkably like Judge Brett's duty formulation:

> [W]henever the circumstances attending the situation are such that an ordinary prudent person could reasonably apprehend that, as a natural and probable consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises, and if such care is not exercised by the party on whom the duty rests, and injury to another person results therefrom, liability on the negligent party to the party injured will generally exist, in the absence of any other controlling element or fact, and this, too, without regard to the legal relationship of the parties.

148 Va. at 318 (quoting *Lisle v. Anderson*, 159 P. 278, 280 (Okla. 1916)). The resemblance was likely not coincidental; the Oklahoma court in *Lisle* had found that principle "deducible" from several authorities, the first of which was Judge Brett's opinion in *Heaven*. 159 P. at 280 (citing *Heaven*, 11 Q.B.D. at 503-09). In 1965, the Court said it had "approved" the same principle and repeated it verbatim (though without attributing the quotation to Judge Brett). *See S. States Grain Mktg. Coop., Inc. v. Garber*, 205 Va. 757, 761 (1965) (quoting *Standard Oil*, 102 Va. at 831-32).

In *Kent v. Miller*, 167 Va. 422 (1937), the Court applied the relational view of duty in a way that echoed Judge Cardozo's view in *Palsgraf*: "there is no such thing as negligence in the abstract, or in general, or as sometimes is said, *in vacuo*. Negligence must be in relation to some person." *Id.* at 425-26. *See also Marshall v. Winston*, 239 Va. 315, 319 (1990) ("Negligence must be in relation to some person." (quoting *Kent*, 167 Va. at 426)); *Rice*, 191 Va. at 605 (stating that duty may arise "from the relation of the parties"); *Perlin v. Chappell*, 198 Va. 861, 864 (1957) (same, quoting *Rice*, 191 Va. at 605).[35]

---

[35] In 1962, the Court cited *Palsgraf* for the first time, using it to exemplify the idea that "[a]n action for negligence only lies where there has been a failure to perform some legal duty which the defendant owes to the party injured." *Balderson v. Robertson*, 203 Va. 484, 487 (1962) (quoting *Williamson v. S. Ry. Co.*, 104 Va. 146, 149 (1905)).

By 1991, the Court in *Dudley* appeared to solidify Virginia's place in the Cardozo camp. *Dudley* held that the operator of a halfway house owed a duty to neighbors to protect them from a dangerous felon over whom it had "take[n] charge" within the meaning of § 319 of the Restatement (Second) of Torts.  241 Va. at 276.[36]  Under lax security, the felon snuck out one night, raping and murdering the plaintiff's decedent, who lived "a short distance" away.  *Id.* at 274.  The Court quoted *Le Lievre* and cited "similar views" set forth in *Palsgraf*, *Kent*, and *Marshall*, stating, "We continue to adhere to them.  '[T]here is no such thing as negligence in the abstract, or in general . . . .  Negligence must be in relation to some person.'"  *Id.* at 278 (alterations in original) (quoting *Marshall*, 239 Va. at 319 (quoting *Kent*, 167 Va. at 425-26)).

*Dudley* added that the duty may be in relation not only to a particular plaintiff but "*to a class of persons—as, for example, all persons within a given area of danger*."  *Id.* (quoting Restatement (Second) of Torts § 281 cmt. b).  The Court emphasized that this was "not a duty to the world at large and that its breach does not constitute mere 'negligence in the abstract.'"  *Id.* Rather, "[t]he scope of the duty will vary with the circumstances of each case, but it is always a duty owed to a discernible individual, or to a class of which that individual is a member."  *Id.*

As in *Palsgraf,* foreseeability played an important role in the Court's analysis.  The victim in *Dudley* was a member of a "class of prospective victims: those who are directly and foreseeably exposed to the risk of bodily harm as a result of the defendant's failure to control his dangerous charge."  *Id.* at 279.  Although the decedent was "not foreseeably at risk as an individual, [she] was a member of a class consisting of those persons 'within a given area of

<hr />

[36] *See* Restatement (Second) of Torts, § 319 ("One who takes charge of a third person, whom he knows or should know to be likely to cause bodily harm to others if not controlled, is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.").  The parallel duty is found in § 41(b)(2) of the Restatement (Third).  *See* Restatement (Third), *supra*, § 41 cmts. a, f.

danger'—that is, the area foreseeably accessible to" the felon supervised by the halfway house.

*Id.*

B. *Cases expanding the factors to be considered*

As noted above, Virginia cases have generally not followed the Prosser (Green) model by examining multifactor policy considerations when determining the existence of duty. Lake, *supra*, at 1566. On several occasions, however, our Supreme Court, at least in dicta, has mentioned the formula popularized by Judge Learned Hand as a duty consideration.[37] *See Shoemaker*, 299 Va. at 478 ("We have also stated that 'in determining whether a duty exists, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant must be taken into account. Imposition of a duty does not depend upon foreseeability alone.'" (quoting *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 159 (1974)). The Hand formula was factor 17 in Professor Cardi's survey of 42 policy factors applied by courts in other States.[38] *See supra* note 30.

C. *RGR: applying Judge Andrews's duty-to-the-world approach*

In *RGR, LLC v. Settle*, 288 Va. 260 (2014), the Court held 4-3 that the owner of an industrial parcel owed a duty to motorists traveling along an adjacent private road not to stack materials along the property line that would obstruct a motorist's view of oncoming trains. *Id.* at

---

[37] The "Hand formula" is "[a] balancing test for determining whether conduct has created an unreasonable risk of harm, first formulated by Judge Learned Hand in [*United States*] *v. Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947)." *Hand formula*, *Black's Law Dictionary* (12th ed. 2024); *see Carroll*, 159 F.2d at 173 ("Since there are occasions when every vessel will break from her moorings, and since, if she does, she becomes a menace to those about her; the owner's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions.").

[38] Professor Cardi found it "dismaying" that a handful of jurisdictions had "expressly incorporate[d] the Learned Hand formula for breach as part of their foundational test for the existence of a duty." Cardi, *supra*, at 1888. He argued that "to express duty as an explicit weighing of these factors is to render the element of breach largely superfluous." *Id.*

283.  In an opinion by Chief Justice Kinser, the majority found no error in the jury instruction "that '[e]very person has the duty to exercise ordinary care in the use and maintenance of its property to prevent injury or death to others.'"  *Id.* at 273, 283.  That opinion was joined by Justices Millette, Mims, and Powell.

Quoting the duty "owed to mankind generally" language from *Overstreet*, the majority said that "[g]eneral negligence principles require a person to exercise due care to avoid injuring others."  *Id.* at 275 (quoting *Overstreet*, 148 Va. at 317).  The majority also cited the third edition of Friend's treatise for the proposition that a "general duty not to injure others arises whenever [a] defendant's conduct creates a risk of harm to others."  *Id.* at 275 (quoting Charles E. Friend, *Personal Injury Law in Virginia* § 1.1.1., at 2 (3d ed. 2003)).

As for whether the danger should have been foreseen, the majority said that foreseeability was relevant only to whether the defendant's conduct was negligent or if it proximately caused the injury, not to whether the defendant owed a duty to motorists in the first place.  *Id.* at 281-82; *see also id.* at 282 ("In sum, whether RGR breached its duty of ordinary care . . . because it was 'reasonably foreseeable that [its] actions might cause injury,' must be distinguished from the question whether a duty existed." (second alteration in original) (quoting *Limberg v. Lent*, 206 Va. 425, 426 (1965)).  Those statements echo Judge Andrews's dissenting view in *Palsgraf*.  As Judge Andrews put it, everyone "owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others."  162 N.E. at 103.  The majority in *RGR* essentially agreed.  The opinion did not mention the Restatement (Third).  But the majority's rejection of foreseeability as a duty consideration also hints toward alignment with § 7(a) of the Restatement (Third), which makes foreseeability a factual question relevant only to breach of duty and proximate cause.

Writing in dissent, Justice McClanahan criticized the majority opinion for "impos[ing] an abstract duty to mankind generally" that "overturns decades of entrenched and long-accepted Virginia law . . . and effectively removes duty as an element of all property and land-use negligence actions." *Id.* at 298. The dissent was joined by Justices Lemons and Goodwyn. The dissent read the majority's use of the duty "to mankind generally" language from *Overstreet* as "a sea change in Virginia jurisprudence." *Id.* at 303. The dissent would have relied on the more limited framing of duty set forth in *Dudley*, *Le Lievre*, *Kent*, and *Marshall*. *Id.* at 305. Justice McClanahan predicted that the "general maxim" invoked by the majority would displace the different levels of duty in other contexts, such as the differing duties of care owed by a property owner to a trespasser, licensee or invitee respectively. *Id.* at 306.

### D. *Quisenberry: reverting to the zone-of-danger approach*

*Quisenberry v. Huntington Ingalls Inc*., 296 Va. 233 (2018), was a "take-home asbestos" case in which the wrongful-death administrator claimed that the decedent developed mesothelioma from exposure to asbestos dust carried home on the clothes of her father, a shipyard worker. 296 Va. at 239. The complaint alleged that, from 1954 until 1969, the daughter "regularly helped launder her father's clothes, shaking off and breathing in asbestos dust in the process." *Id.* During that timeframe, the shipyard allegedly "knew or had reason to know of the dangers that asbestos posed to workers' family members." *Id.*

In an opinion by Senior Justice Millette, joined by Justices Mims, Powell, and McCullough, the majority held that, under those facts, the shipyard owed a duty of care to the employee's family members. *Id.* at 238. The majority said that "[t]he principles of duty in general negligence claims under such circumstances in Virginia are familiar and established. They were set forth in *RGR* . . . and we reaffirm them today. 'General negligence principles require a person to exercise due care to avoid injuring others.'" *Id.* at 242 (quoting *RGR*, 288

- 41 -

Va. at 275). The majority opinion referenced the citations from *RGR* to *Overstreet* and to Friend's treatise. *Id.* It also said that "the '"broad common law maxim" *sic utere tuo ut alienum non laedas* requires that "one must so use his own rights as not to infringe upon the rights of another."'" *Id.* (quoting *RGR*, 288 Va. at 242).

But the majority in *Quisenberry* treated the relevance of foreseeability very differently from the majority in *RGR*. As already noted, the *RGR* majority indicated that foreseeability was relevant only to breach of duty and proximate cause, not duty. 288 Va. at 281-82. The majority in *Quisenberry*, by contrast, relied on the foreseeability of a family member's exposure to take-home asbestos dust in concluding that the shipyard owed a duty of care to the family members: "This case relies on an existing duty of care, firmly established in Virginia law and well-rooted in common law, establishing liability to those members of a class of persons facing *a recognizable risk of harm* from one's conduct." 296 Va. at 248 (emphasis added).

Chief Justice Lemons dissented, joined by Justices McClanahan and Kelsey. *Id.* at 250.[39] Echoing Justice McClanahan's minority view in *RGR*, the dissent worried that the majority "opinion adopts the concept of duty to mankind generally, an empty duty 'owed to all the world,' and is unprecedented in Virginia." *Id.* at 250 (Lemons, C.J., dissenting). The dissent argued that "[t]he duty created by the majority . . . is limitless" and "would 'expand traditional tort concepts beyond manageable bounds and create an almost infinite universe of potential plaintiffs.'" *Id.* at 256-57 (quoting *CSX Transp., Inc. v. Williams*, 608 S.E.2d 208, 209 (Ga. 2005)).[40]

---

[39] Justice McClanahan also wrote a separate dissent in which Chief Justice Lemons and Justice Kelsey joined. *Id.* at 258.

[40] Although I focus principally on the dissent's treatment of the duty-to-the-world issue, I note that the dissent raised other points as well, including that the majority "conflate[d] duty and proximate cause by relying on foreseeability to determine whether a duty exists," "undermine[d] the Workers' Compensation Act, . . . a carefully balanced bargain defining how injuries arising from the workplace are to be compensated," and "create[d] a new cause of action in territory that should be the domain of the legislature." *Id.* at 250.

Of course, the breadth of a majority opinion should not be judged by a dissent's claim that the opinion sweeps too far. *See, e.g.*, *Lee v. Kemna*, 534 U.S. 362, 386 (2002) ("Cassandra-like predictions in dissent are not a sure guide to the breadth of the majority's ruling." (quoting *United States v. Travers*, 514 F.2d 1171, 1174 (2d Cir. 1974) (Friendly, J.))). Indeed, in *Quisenberry*, the majority did not acquiesce in the dissent's characterization of the breadth of its reasoning.

Instead, the *Quisenberry* majority weaved into its opinion Cardozo's relational view of duty. The majority said that duty is "not abstract"; rather, "a specific course of conduct gives rise to a specific duty extending to specific persons." 296 Va. at 242. The majority also quoted *Dudley* for the proposition that "[t]he scope of the duty will vary with the circumstances of each case, but it is always a duty owed to a discernible individual, or to a class of which that individual is a member." *Id.* (quoting *Dudley*, 241 Va. at 278).

This was not a duty to the world, said the majority, but a duty "owed 'to those within reach of a defendant's conduct.'" *Id.* (quoting *RGR*, 288 Va. at 276). The majority then invoked *Palsgraf* for the idea that "risk imports relation; it is risk to another or to others within the range of apprehension." *Id.* at 243 (quoting *Palsgraf*, 162 N.E. at 100). "This relationship, however temporary, is essential to duty . . . ." *Id.* The majority also quoted *Kent* and *Le Lievre* for the relational view of duty. *Id.* "Negligence must be *in relation to* some person." *Id.* (quoting *Kent*, 167 Va. at 425-26). "A man is entitled to be as negligent as he pleases toward the world as a whole if he owes no duty to them." *Id.* (quoting *Dudley*, 241 Va. at 277 (quoting *Le Lievre*, 1 Q.B. at 497)).

The most recent edition of Friend's treatise (now edited by Kent Sinclair) reads *RGR* and *Quisenberry* quite expansively, though cautioning that "[f]urther case law from the Court will be required to clarify whether the shift in principles is as dramatic as the three dissenting Justices [in

*RGR*] perceived it to be." 1 Kent Sinclair, *Personal Injury Law in Virginia* § 2.1[C][2], at 2-5 (4th ed. 2024). The treatise says that the 4-3 opinion in *Quisenberry* "cements understanding of the breadth of *RGR* and portends even more strongly a sea change in all of tort law in the Commonwealth." *Id.* § 2.1[D], at 2-12. At another point, while conceding that "[i]t may be speculative to observe," the treatise posits that *RGR* and *Quisenberry* offer "a simpler, amazingly broad, duty analysis [that] has the potential to crowd out more carefully crafted case law on a topic like assumption of duty developed over the years." *Id.* § 2.4, at 2-34.

Those predictions are likely premature. For one thing, as shown above, the majority opinions in *RGR* and *Quisenberry* are not congruent. While *RGR*'s rejection of foreseeability in duty analysis resembles Judge Andrews's approach and § 7(a) of the Restatement (Third), *Quisenberry* relied at least in part on the foreseeability of the injury to establish a take-home duty. And the *Quisenberry* majority seemed to incorporate the more limited, relational view of duty, perhaps trying to harmonize the conflicting strands in Virginia law described above.

For another thing, since *RGR* and *Quisenberry* were decided, the Court has continued to cite the more traditional, relational view of duty. *See Shoemaker*, 299 Va. at 477-48 (quoting *Dudley*, 241 Va. at 277 (quoting *Le Lievre*, 1 Q.B. at 497)); *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 79 (2019) (same). So it is probably too early to say that *RGR* and *Quisenberry* portend the "sea change" asserted in the current iteration of Friend's treatise.

IV. *Where do we go from here?*

Perhaps not much has changed since Dean Prosser wrote in 1953 that the state of tort law was a sea "of troubled waters, in which any one may fish." *Palsgraf Revisited*, *supra*, at 12. With such conflicting strands of authority, how should Virginia lawyers argue for or against the existence of a duty of care in cases in which our Supreme Court has not yet said that a duty exists? And how should Virginia judges evaluate those arguments?

The historical survey here suggests at least four lessons.

First, litigants should avoid rote citation to the duty-to-the-world theory or the relational theory of duty without acknowledging the ample authorities populating both sides of that divide. These theories operate at a high level of generality that cannot provide the surgical precision needed to resolve hard cases. For instance, neither the duty-to-the-world theory nor the zone-of-danger approach can explain the rule in *Williamson v. Old Brogue, Inc.*, 232 Va. 350 (1986), where the Court held that a vendor of alcoholic beverages is not liable for foreseeable injuries sustained by a third party caused by the vendor's intoxicated patron. *Id.* at 353; *see also Robinson v. Matt Mary Moran, Inc.*, 259 Va. 412, 417-18 (2000) (extending *Williamson* to hold that a vendor was not liable for damages resulting from serving alcohol to a minor).[41] Nor can those theories explain *Gray v. INOVA Health Care Services*, 257 Va. 597 (1999), where the Court held that the hospital owed no duty to a mother for the emotional distress she suffered witnessing her three-year-old child overdose from negligently administered medication. *Id.* at 598-600 ("Any negligence in administering the tests was a breach of the duty owed to [the child], not her mother."). Advocates will need more than general maxims to justify recognizing or rejecting a duty of care in a particular case.

Second, careful consideration should be given to whether a common-law precursor supports or undercuts recognizing a duty in a particular case. While the idea of duty was not explicitly articulated in the common law of England before 1792, *see supra* Part I, common-law surrogates may still be helpful. For example—apropos of this case—the origins of the

---

[41] *Williamson* and *Robinson* reasoned that "the common law considers the act of selling the intoxicating beverage as too remote to be a proximate cause of an injury resulting from the negligent conduct of the purchaser of the drink." *Williamson*, 232 Va. at 353; *Robinson*, 259 Va. at 417. But the Court recently clarified that this was also a no-duty ruling. *See Tingler*, 298 Va. at 80 n.8 (describing *Williamson* as "holding that the common law does not recognize a tort duty to not serve alcohol to an inebriated patron who could foreseeably injure others).

voluntarily assumed duty applied here can be traced to at least 1703. *See Coggs v. Bernard*, 2 Ld. Raym. 909, 92 Eng. Rep. 107 (K.B. 1703). *Coggs* held that a person who volunteered without compensation to transport barrels of brandy was liable to the owner for damages resulting from negligent handling that resulted in the loss of several barrels. *Id.* at 919, 92 Eng. Rep. at 113 (Holt, C.J.) ("[I]f a man . . . miscarries in the performance of his trust, an action will lie against him for that, though no body could have compelled him to do the thing.").

More often, however, an English common-law precursor will not exist. Even so, the non-existence of a practice or custom under English common law does not necessarily mean that English common law rejected it. In *Midkiff v. Midkiff*, 201 Va. 829 (1960), for instance, the Court held that no common-law-tort immunity barred a negligence claim between unemancipated siblings. *Id.* at 831-32. While the defendant there argued that such a suit was "not permitted under the common law," he "cite[d] no case, and [the Supreme Court was] not . . . able to find any . . . in support of the assertion." *Id.* at 831. "It cannot be assumed[] [just] because no authority has been found . . . that no such right existed at common law." *Id.* "On the contrary, it may be considered that since an infant has the right to sue for torts committed against him no prohibition existed against suing his minor brother under the common law." *Id.* *Midkiff* also noted the flexibility of modern common law to adjust to new situations:

> The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles [that] are designed to meet, and are susceptible of adaptation to, new institutions, conditions, usages, and practices, as the progress of society may require. So, changing conditions may give rise to new rights under the law . . . .

*Id.* at 832 (quoting C.J.S., Common Law, § 2, p. 613); *accord Williamson*, 232 Va. at 353 ("The common law is dynamic, evolves to meet developing societal problems, and is adaptable to society's requirements at the time of its application by the Court.").

Third, litigants confronted with a hard case should confront the hard questions. The lawyer advocating a duty of care should help the Court understand why Virginia law has not yet recognized it and how doing so would square with other duty precedents. If the issue has divided courts in other States or involves difficult policy or line-drawing questions, the proponent should explain why a Virginia appellate court should recognize the duty, rather than deferring to the General Assembly to decide that question in the first instance. *See, e.g.*, *Williamson*, 232 Va. at 354 ("Where, as here, the issue involves many competing economic, societal, and policy considerations, legislative procedures and safeguards are particularly appropriate to the task of fashioning an appropriate change, if any, to the settled rule.").

Conversely, the advocate opposing a duty of care when a defendant's affirmative acts caused the harm should explain why the defendant should not bear the loss. "Duty calls for a decision as to whether, assuming the defendant acted unreasonably and was a proximate cause of the plaintiff's injury, the court should impose on the defendant a *legal* obligation to have acted reasonably in the first place." Cardi, *supra*, at 1913. Particularly if the defendant was in the best position to avoid the injury, the duty opponent should explain why the defendant should not bear the cost of his own negligence.

Finally, until our Supreme Court settles the question, advocates should continue to seek out a unifying theory of duty that maps onto our existing precedents. To be sure, that is a daunting task. The law of duty remains one of the most intractable areas in tort law. As long ago as 1883, it was grumbled that there was no unifying theory but only case-by-case adjudications, resulting in a "wilderness of single instances" in which the courts recognized duty in some cases but not others:

> The law in regard to negligence is the most uncultivated part of the "wilderness of single instances" of which our law consists.
> Perhaps this cannot be avoided, as the world has not, in the matter

> of wrongs, agreed upon any wide principle, such as "perform your promises," which is at the bottom of the law of contracts.

*The Duty of Care Towards One's Neighbour*, 18 L.J. 618, 619 (1883). Professor Green echoed that frustration in 1928: "Let it be said again that this is the dimmest part of tort law, perhaps of all law. It presents the hardest problems in any field." Green, *supra*, at 1026. Those troubled waters remain roiled today. *E.g.,* W. Jonathan Cardi & Michael D. Green, *Duty Wars*, 81 S. Cal. L. Rev. 671, 671 (2008) ("The concept of duty in tort law remains in turmoil."). Even supporters of the Restatement (Third)'s systematic approach to establishing duty recognize that "the duty war rages on, and it shows no sign of stopping." Timothy Lockwood Kelly, *The Third Restatement and the Jurisprudential Evolution of Duty: Tracking the "Duty War" in Palsgraf and Beyond (With a Focus on the Influence of H.L.A. Hart)*, 13 Drexel L. Rev. 87, 141 (2020).

This case does not require our Court to propose a unifying theory of duty that is easy to apply and that explains all Virginia precedents. But by recognizing the different strands of duty jurisprudence weaved through Virginia tort law, the bench and bar can better frame the issue the next time the duty question arises.